**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| In re Application of: | ) | |
| | ) | |
| TECHTERYX LTD., | ) | |
| | ) | |
| Applicant, | ) | Case No. _____ |
| | ) | |
| FOR AN ORDER TO TAKE | ) | |
| DISCOVERY FOR USE IN FOREIGN | ) | |
| PROCEEDINGS PURSUANT TO | ) | |
| 28 U.S.C. § 1782. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF APPLICANT'S**
**APPLICATION FOR AN ORDER TO CONDUCT DISCOVERY**
**FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

# **TABLE OF CONTENTS**

I.  INTRODUCTION ........................................................................................................... 1

II.  FACTUAL BACKGROUND ......................................................................................... 3

    A.  Parties ................................................................................................................... 3

    B.  The TUSD Business ............................................................................................. 3

    C.  Techteryx Acquires the TUSD Business .............................................................. 4

    D.  The Pre-Acquisition Direction of TUSD Reserves to Aria CFF .......................... 5

    E.  Purported Investments in the Aria Entities Made on Behalf of Techteryx ........................... 7

    F.  Coupon and Redemption Delays ......................................................................... 9

    G.  The Truth Comes to Light .................................................................................. 10

    H.  The Aria Entities Paid Others to Participate in the Fraud ................................... 14

    I.  The Apparent Use of Techteryx's Investments to Pay Unrelated Debts and Make Risky Loans .................................................................................................................. 15

    J.  Techteryx's Anticipated Singapore Litigations ................................................. 17

III.  ARGUMENT ............................................................................................................... 19

    A.  Techteryx's Application Satisfies Section 1782's Statutory Factors ................. 19

       1.  Respondents Are Found in This District ........................................................ 19

       2.  The Discovery Sought Is "For Use" in Foreign Proceedings ........................ 20

       3.  Techteryx Is an "Interested Person" Under Section 1782 ............................. 21

    B.  All Discretionary *Intel* Factors Favor Permitting the Discovery Techteryx Seeks ........... 21

       1.  The Evidence Sought by Techteryx Will Not Be Available in the Singapore Litigations or Obtainable by Other Means .................................................... 21

       2.  Singapore Courts Are Receptive to Section 1782 Discovery ........................ 22

       3.  Techteryx's Application Is Not an Attempt to Circumvent Singaporean Proof-Gathering Restrictions ........................................................................ 22

       4.  The Requests Are Narrowly Tailored ........................................................... 23

IV.  CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACE Oilfield Rentals, LLC* v. *W. Dakota Welding & Fabrication, LLC*,
2021 WL 4270026 (W.D. Okla. Aug. 19, 2021) ................................................................. 23-24

*Amgen Inc.* v. *Hill*,
2015 WL 1401237 (D. Utah Mar. 25, 2015) ...........................................................................22

*In re Application of Perez Pallares*,
2010 WL 4193072 (D. Colo. Oct. 20, 2010) ..........................................................................1n

*In re Ex Parte Application of Regeneron Pharms., Inc.*,
2025 WL 2338037 (D. Del. Aug. 13, 2025) ............................................................................22

*In re Application of Savan Magic Ltd.*,
2017 WL 6454240 (D. Nev. Dec. 18, 2017).............................................................................23

*In re Batbold*,
2021 WL 4596536 (S.D.N.Y. Oct. 6, 2021)...........................................................................22

*Deloraze Ltd.* v. *Shimogori*,
2025 WL 1000034 (E.D. Cal. Apr. 3, 2025)............................................................................20

*In re Fialdini*,
2021 WL 411105 (D. Colo. Feb. 5, 2021) ......................................................................... 19-20

*Gonzalez* v. *Verfruco Foods, Inc.*,
2023 WL 1794391 (11th Cir. Feb. 7, 2023) ...........................................................................24

*In re Hattori*,
2021 WL 4804375 (N.D. Cal. Oct. 14, 2021).................................................................... 22-23

*Intel Corp.* v. *Advanced Micro Devices*,
542 U.S. 241 (2004)............................................................................................... *passim*

*Interbrew Cent. Eur. Holding BV* v. *Molson Coors Brewing Co.*,
2013 WL 5567504 (D. Colo. Oct. 9, 2013) ............................................................................21

*Municipality of Mariana*,
713 F. Supp. 3d 1125 (D.N.M. 2024) ...............................................................................20, 22

*In re Request for Int'l Jud. Assistance from the Norrkoping Dist. Ct., Sweden*,
219 F. Supp. 3d 1061 (D. Colo. 2015)...............................................................................19, 22

*Salt Mobile S.A.* v. *Liberty Glob. Inc.*,
  2021 WL 2375864 (D. Colo. June 10, 2021)...........................................................................20

*In re Sri Trang Gloves (Thailand) Pub. Co. Ltd.*,
  2025 WL 2411137 (S.D.N.Y. Aug. 20, 2025)..................................................................20, 22

*In re Third Eye Cap. Corp.*,
  2022 WL 714758 (D.N.J. Mar. 10, 2022)..............................................................................20

*Westjet Airlines, Ltd.* v. *Lipsman*,
  2015 WL 7253043 (D. Colo. Nov. 17, 2015) ........................................................................21

**Statutes**

28 U.S.C. § 1782.................................................................................................. *passim*

Applicant Techteryx Ltd. ("Techteryx") seeks an *ex parte* order from this Court pursuant to 28 U.S.C. § 1782 ("Section 1782") authorizing Techteryx to serve Aria Commodities-USA, LLC ("Aria USA"), Aria Commodities Americas LLC ("Aria Americas"; together with Aria USA, the "Aria USA Entities"), and Lane Walker ("Walker"; together with the Aria USA Entities, "Respondents") with the subpoenas attached to the application as Exhibits 1-6 (the "Subpoenas"), seeking relevant documents and testimony (the "Requests"). The Subpoenas seek information relevant to anticipated court proceedings in Singapore (the "Singapore Litigations"). Such an order is proper under Section 1782 because (1) the application satisfies the three statutory requirements set forth in Section 1782, and (2) the *Intel* factors (discussed below) weigh in Techteryx's favor.[1]

## I.     INTRODUCTION

Through this action, Techteryx seeks an order authorizing it to obtain discovery from Respondents for use in the Singapore Litigations. Techteryx intends to file suit in the General Division of the High Court of the Republic of Singapore, asserting claims against four Singaporean entities, including for dishonest assistance, knowing receipt, and unlawful means conspiracy, in relation to a massive, years-long international fraud through which several interrelated investment fund entities, all of which share the name "Aria" and

---

[1] Section 1782 applications are frequently brought *ex parte* because "the parties will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it." *In re Application of Perez Pallares*, 2010 WL 4193072, at *2 (D. Colo. Oct. 20, 2010).

are managed or controlled by Matthew Brittain, defrauded Techteryx. Among other things, Brittain and his co-conspirators diverted approximately half a billion dollars from the TUSD Reserves (as defined below) to an Aria affiliate that Techteryx had never approved.

The Aria USA Entities, together with their principal Walker, comprise the U.S. arm of the Aria entities, and, upon information and belief, received, transferred, and helped to further obfuscate up to $200 million misappropriated from Techteryx. Given their role in this scheme, Respondents possess documents and information highly relevant to the claims Techteryx plans to assert in the Singapore Litigations. Accordingly, this Court should grant Techteryx's application, allowing it to obtain discovery.

*First*, Techteryx's application satisfies Section 1782's three statutory requirements: Respondents are found in this District; the discovery Techteryx seeks is for use in the Singapore Litigations; and Techteryx is an "interested person" in the Singapore Litigations.

*Second*, the discretionary factors set forth by the Supreme Court in *Intel Corp.* v. *Advanced Micro Devices*, 542 U.S. 241 (2004), support Techteryx's application. Because Respondents will not be defendants in the Singapore Litigations—and therefore cannot be compelled by a Singaporean court—Techteryx has no means other than Section 1782 to obtain the discovery it seeks; the Singaporean court in the Singapore Litigations will be receptive to the documents and testimony sought; there is no statute, order, or public policy under Singapore law preventing Techteryx from using Section 1782 to seek such discovery; and the scope of discovery sought pursuant to the Subpoenas is narrowly tailored, and will not be intrusive or burdensome to Respondents.

2

## II.    FACTUAL BACKGROUND

### A.    Parties

Applicant Techteryx is a private limited liability company incorporated in the British Virgin Islands, with its registered address located in Road Town, British Virgin Islands.  (*See* March 30, 2026 Declaration of Li Jinmei ("Li Decl.") ¶ 1).  Techteryx owns the TrueUSD ("TUSD") stablecoin business, providing a cryptocurrency token whose value is pegged to the U.S. dollar.  (*See id.* ¶ 9).

Respondents Aria USA and Aria Americas are limited liability companies organized under the laws of Kansas with their principal places of business in Edmond, Oklahoma.  (*Id.* ¶ 5).  Public records indicate that Walker is the only member who owns 5% or more of the capital of each entity, though Aria Americas was previously a subsidiary of Aria USA. (*Id.*).

Respondent Walker resides in Edmond, Oklahoma, at the same address where the Aria USA Entities have their principal place of business.  (*Id.* ¶ 6).  Besides owning those entities, Walker has been an officer, director, and/or consultant for other relevant Aria entities.  (*Id.*).

### B.    The TUSD Business

In March 2018, TrueCoin LLC ("TrueCoin") launched the TUSD business, whereby TrueCoin issued, serviced, and redeemed cryptographically secured digital currency tokens called TUSD.  (*See id.* ¶ 7).  TrueCoin developed and marketed TUSD as a "stablecoin," meaning the value of TUSD would match the U.S. dollar, and each token in circulation was supposed to be backed 1:1 with U.S. dollar reserves (the "TUSD Reserves").  (*See id.*).

The TUSD Reserves were purportedly kept and safeguarded by independent licensed financial institutions, in escrow, and maintained in either U.S. fiat currency or equivalent assets in values at least equal to the amount of outstanding TUSD at any given time. (*Id.*).

TUSD's operations can be summarized as follows:

- TrueCoin maintained a website through which it marketed TUSD, which was traded on various digital asset platforms. (*Id.* ¶ 8).

- After supplying certain information for a required know-your-customer ("KYC") process, a user interested in acquiring TUSD could order a quantity of tokens from the website in exchange for an equivalent amount in U.S. dollars, which would be held in the TUSD Reserves. (*Id.*).

- TrueCoin custodied the TUSD Reserves with certain regulated financial institutions, including trust companies. (*Id.*).

- The quantity of TUSD ordered would then be minted on the blockchain and sent to the user. (*Id.*).

- If TUSD users wished to redeem their tokens, they could do so via the TrueCoin website. Redeemed tokens would be "burned"—meaning they would cease to exist—and an equivalent amount of U.S. dollars would be returned to the user from the TUSD Reserves. (*Id.*).

TUSD derived its value from TrueCoin's representation to the public that the TUSD Reserves were safely maintained, which allowed TUSD users to redeem their TUSD for U.S. dollars on demand. Maintaining the requisite liquidity required that the TUSD Reserves be invested in safe, short- to medium-term investment positions. (*See id.* ¶ 7).

### C.    Techteryx Acquires the TUSD Business

Pursuant to a Strategic Alliance Agreement dated December 2, 2020, Techteryx purchased the TUSD business from TrueCoin, including but not limited to TrueCoin's

rights and interests in the TUSD Reserves, for $28 million and other consideration (the "Acquisition"). (*See id.* ¶ 9).

In connection with the Acquisition, Techteryx engaged TrueCoin to continue managing the day-to-day operations of the TUSD business, which TrueCoin did until July 13, 2023. (*See id.*). TrueCoin's management of the TUSD operations included minting and redeeming TUSD, performing KYC and anti-money-laundering checks, staffing a support team, providing infrastructure support, maintaining audit and regulatory compliance services, and managing and maintaining relationships with financial institutions that provide banking services for the TUSD Reserves. (*See id.*). Alex de Lorraine ("ADL")—TrueCoin's then Head of Finance and Business Operations, and the CEO of TrueCoin's parent company—was named the primary relationship manager between TrueCoin and Techteryx, and was authorized to execute decisions for investing the TUSD Reserves in the approved investment products. (*Id.* ¶ 10).

**D.      The Pre-Acquisition Direction of TUSD Reserves to Aria CFF**

Before the Acquisition, in or around May 2019, TrueCoin engaged Legacy Trust Company Ltd. ("Legacy") to provide escrow services for the TUSD Reserves, and in or around March 2020, Legacy engaged Crossbridge Capital Asia Pte Ltd. ("Crossbridge") to provide investment management services for the TUSD Reserves. (*Id.* ¶ 11).

Thereafter, Legacy and Crossbridge recommended to TrueCoin, in a March 31, 2020 investment proposal, that a significant portion of the TUSD Reserves be invested in a Cayman Islands trade finance fund called Aria Commodity Finance Fund

("Aria CFF"), which Techteryx now understands invested in medium- to long-term illiquid trade finance products—rather than short- to medium-term liquid assets. (*See id.* ¶ 12).

Aria CFF is part of a network of several "Aria" entities Brittain owned and/or controlled. (*See id.* ¶ 13). Among other things, Brittain is or was at all relevant times (1) the Chief Investment Officer of Aria CFF; (2) the sole director and shareholder of ARIA Capital Management Ltd. ("Aria Capital"), which is the sole holder of all management shares of Aria CFF; and (3) the managing director and general manager of Aria Commodities DMCC ("Aria DMCC"). (*Id.*). Aria DMCC is the entity to which, as detailed below, Brittain and his co-conspirators diverted approximately half a billion dollars of the TUSD Reserves without Techteryx's knowledge or approval; it is a Dubai private company that was wholly owned during the relevant period by Cecilia Brittain— Matthew Brittain's wife, a school teacher with no financial background or experience. (*Id.*). In all, Brittain has identified himself as the ultimate beneficial owner of more than 20 Aria entities in three corporate structures worldwide, including the Aria USA Entities (notwithstanding public records indicating that Walker owns those entities). (*See id.*).

Between around June and December 2020, TrueCoin approved directing at least $97 million worth of the TUSD Reserves to Aria CFF for purported investment (the "Pre-Acquisition Investments"). (*Id.* ¶ 14). Upon the Acquisition, all of TrueCoin's rights, title, and interest in and to the TUSD Reserves passed to Techteryx, along with the rest of the TUSD business. (*Id.*).

Thus, from at least July 2020—at which time TrueCoin had approved the Pre-Acquisition Investments—TrueCoin, Legacy, and Crossbridge knew, or should have

6

known, that there were not sufficient Reserves in cash or cash equivalents to back the amount of outstanding TUSD tokens. Yet that reality was kept hidden from Techteryx.

E.    **Purported Investments in the Aria Entities Made on Behalf of Techteryx**

Around the time of the Acquisition, on the recommendation of TrueCoin—which, as noted, continued managing the TUSD business—Techteryx appointed First Digital Trust Ltd. ("FDT") to replace Legacy, and Finaport Pte Ltd. ("Finaport") to replace Crossbridge, in providing escrow and investment management services, respectively. (*See id.* ¶ 15). Despite the change in entities, the same individuals remained in charge— Legacy's CEO and director (Vincent Chok) was also the CEO and director of FDT, Crossbridge's CEO and partner (Yai Sukonthabhund) joined Finaport as a partner, and ADL continued to implement instructions for investing the TUSD Reserves as the primary representative of TrueCoin. (*Id.*). As such, the same individuals who recommended investing at least $97 million of the TUSD Reserves with Aria CFF (ADL, Chok, and Sukonthabhund) continued managing the TUSD Reserves after the Acquisition.

Aria CFF created offering and marketing materials, which included an April 2020 Fact Sheet and June 2019 and May 2020 Private Placement Memoranda, all of which featured numerous material misrepresentations. (*See id.* ¶ 16). Among other things, (1) the June 2019 Private Placement Memorandum falsely described Aria CFF as registered with the Cayman Islands Monetary Authority ("CIMA"), which did not in fact take place until July 2020; and the materials otherwise falsely claimed that (2) Aria CFF would invest at least 80% of its net assets in trade finance and the remaining 20% in other fixed income securities and money market instruments; (3) the average duration of the contracts

7

underlying Aria CFF's trade finance investments was 42 days; (4) all of the fund's transactions would be insured by A-rated institutions; and (5) Aria CFF would file audited accounts with CIMA annually.  (*See id.*).  Contrary to these misrepresentations, Brittain has stated under oath that Aria CFF, in fact, invested in illiquid medium- to long-term investments.

ADL, Chok, and Sukonthabhund also made numerous other material misrepresentations about Aria CFF, including the following:

- On February 4, 2021, Chok fraudulently misrepresented that Aria CFF invests in interest-bearing products with minimum fluctuations in value that could be redeemed on a quarterly basis, and that Aria CFF's insurance coverage provided a high level of safety.  (*See id.* ¶ 17).

- On February 8, 2021, Sukonthabhund fraudulently misrepresented that Aria CFF's investments were insured.  (*See id.*).

- On July 9, 2021, ADL fraudulently misrepresented that Aria CFF's investments would have a duration of 60 to 90 days.  (*See id.*).

- On February 25, 2022—in response to a query from Techteryx about whether Aria CFF was a risky investment—ADL fraudulently misrepresented that Aria CFF's investments were triple insured and invested in trade finance, and that Techteryx could redeem its investments within 90 days.  (*See id.*).

A total of $468 million of TUSD Reserves was ultimately allocated for placement with Aria CFF.  But instead of directing these investments into Aria CFF (the approval for which was procured through fraudulent misrepresentations), ADL, Chok, and Sukonthabhund, with the aid of Brittain, instead diverted $456 million of the TUSD Reserves to another entity—Aria ***DMCC***.  (*Id.* ¶ 18).

Although Brittain's statements on the subject have been inconsistent, he has represented under oath in a Dubai International Financial Centre ("DIFC") court

8

proceeding that Aria DMCC transferred $200 million of the Reserves to a U.S. affiliate, which upon information and belief was one or both of the Aria USA Entities. (*See id.* ¶ 19). Brittain claimed that the TUSD Reserves sent to the Aria USA Entities were then transferred to an Australian Aria entity to invest in, among other things, substantial quantities of Australian grain. (*Id.*).

Brittain further represented under oath in the DIFC court proceeding that Aria CFF and Aria DMCC had entered into a loan agreement dated October 1, 2021, for Aria CFF to provide a loan of $250 million to Aria DMCC. (*Id.* ¶ 20). This loan agreement was signed by Brittain on behalf of Aria CFF as its investment manager, and signed by Walker on behalf of Aria DMCC as its executive director. (*Id.*). Brittain also produced in the DIFC proceeding a credit facility agreement of approximately $175 million dated March 25, 2022, between Aria CFF and Aria AAAX Australia Pty Ltd. ("Aria AAAX"), which Walker signed on behalf of the latter as its purported director. (*Id.* ¶ 21).

The transfers between Aria DMCC, the Aria USA Entities, and Aria AAAX were made without Techteryx's knowledge or approval. (*See id.* ¶ 22). Indeed, as described below, Techteryx was unaware that the TUSD Reserves had been misappropriated and transferred to a Dubai private company until years later, and only after hiring a forensic financial investigation firm to trace the proceeds of the fraudulent scheme. (*Id.*).

### F.    Coupon and Redemption Delays

In mid-2022—still unaware that approximately half a billion dollars from the TUSD Reserves had been unlawfully misappropriated—Techteryx sought to redeem certain of its purported investments in Aria CFF. (*See id.* ¶ 23). But Aria CFF's repayments were

delayed, or only paid in part: between October 2022 and May 2023, out of redemptions totaling $82.8 million (which FDT, Brittain, and ADL promised to honor), Aria CFF returned only $63.15 million. (*See id.*).

Brittain, ADL, Chok, and Sukonthabhund tried to explain these delays and underpayments away by insisting that Aria CFF was a safe and liquid investment. (*See id.* ¶ 24). For example, during an October 21, 2022 call that included ADL, Chok, and Sukonthabhund, Brittain falsely claimed that Aria CFF was fully collateralized, was insured by AIG and Liberty Mutual, and faced no liquidity concerns. (*See id.*). And on November 24, 2022, Techteryx's agents and advisors attended an in-person meeting at Aria CFF's offices in Dubai, during which Brittain, ADL, and Chok continued to insist that Aria CFF was liquid, and blamed the delayed redemption payments on Aria CFF sharing the name "Aria" with entities on terrorist financing lists, which supposedly caused banks to delay payment. (*See id.*).

In May 2023, October 2023, and February 2024, Techteryx made further redemption requests, collectively seeking the return of the net investment amount thought to be remaining with Aria CFF—$501.85 million. (*See id.* ¶ 25). Those requests remain unpaid. (*See id.*).

## G.    The Truth Comes to Light

In around April 2023, Techteryx engaged a forensic financial investigation firm to investigate the Aria entities and the purported investment of the TUSD Reserves. (*See id.* ¶ 26). That investigation revealed that (i) a substantial portion of the TUSD Reserves had been misdirected to Aria DMCC—the Dubai private company wholly owned by Brittain's

10

wife during the relevant period—and (ii) the TUSD Reserves had not been invested in liquid, insured, short- to medium-term instruments, as Brittain and his co-conspirators had repeatedly represented to Techteryx, but were instead invested in illiquid, uninsured, medium- to long-term investments or commodities, or were otherwise misused. (*See id.*).

Brittain has admitted that $456 million of the TUSD Reserves were misappropriated to Aria DMCC. Among other things, he stated under oath that FDT intentionally sent the TUSD Reserves to Aria DMCC,[2] and that in December 2022, Brittain, Chok, Aria CFF, Aria DMCC, and FDT executed false subscription documents—in order to conceal their fraudulent conduct—to make it appear to Techteryx that the TUSD Reserves had been invested in Aria CFF. (*See id.* ¶ 28). Brittain also admitted that the reason FDT sent $456 million of the TUSD Reserves to Aria DMCC (rather than Aria CFF) was to allow Brittain to more easily send secret "commissions" through a Hong-Kong incorporated entity called Glass Door Limited ("Glass Door"), which was related to FDT/Legacy, and is operated by Sukonthabhund. (*See id.* ¶ 30).

Moreover, Brittain has now admitted under oath in the DIFC proceeding that it is difficult for the Aria entities to trace the flow of funds and say how the TUSD Reserves were invested, notwithstanding his and his co-conspirators' earlier claims that the funds were safely invested in Aria CFF. (*See id.* ¶ 28). And although Brittain has provided

---

[2] Notwithstanding this claim, Chok separately testified under oath in a Hong Kong court proceeding that the decision to direct the TUSD Reserves to Aria DMCC was made by Aria CFF, not FDT. The inconsistency between Brittain's and Chok's explanations—both of which were made under oath—suggests that at least one, and possibly both, were lying about the decision to divert the TUSD Reserves to Aria DMCC.

conflicting information about how the TUSD Reserves were invested, he has represented under oath that Aria DMCC invested in, among other things: (1) coal mines in Tanzania; (2) wind- and solar-related assets in Australia; (3) interests in a bitumen storage terminal; (4) grain silos in Latvia; (5) grain reserves in Western Australia; (6) a waste-lead battery plant in Tanzania; and (7) a deep-water port and storage facility in Australia. (*See id.* ¶ 29). It is self-evident that none of these are short- to medium-term, low-risk investments.

Indeed, an independent auditor's report concerning the financial position of Aria CFF—which Aria CFF's auditor completed in November 2023 and subsequently submitted to CIMA[3]—shows that for the year ended June 30, 2021, Aria CFF invested in medium- to long-term assets (rather than short- to medium-term assets) and that the fund's assets were illiquid (rather than liquid), meaning there was a material risk that the fund would not be able to meet investor redemptions. (*See id.* ¶ 27, Exhibit S at 8, 21). Despite that risk, Brittain, ADL, Chok, and Sukonthabhund persisted in falsely representing that the TUSD Reserves were invested in safe, insured, short- to medium-term assets.

Certain aspects of the fraudulent scheme have already prompted litigation. In September 2024, the Securities and Exchange Commission ("SEC") sued TrueCoin and its affiliates, resulting in a settlement agreement executed by ADL. (*See id.* ¶ 31). According

---

[3] Although the Aria CFF investment materials shared with Techteryx fraudulently stated that Aria CFF would annually file audited financial statements with CIMA, Aria CFF did not timely prepare audited financial statements for at least the years 2019-2022. Indeed, only in 2023 did Aria CFF produce audited financial statements for the year ending June 30, 2021. But since those statements predate most of the relevant payments to Aria DMCC, the statements offer little insight into the current financial position of the Aria entities or the misappropriation of the TUSD Reserves.

to the complaint, an SEC investigation revealed that (1) TrueCoin falsely represented the sufficiency of the TUSD Reserves when it had invested a substantial portion in a speculative offshore commodity fund (although the complaint did not name that fund, it was certainly referring to the Aria entities), and (2) TrueCoin knew or should have known that the investments were not liquid. (*See id.*, Exhibit H ¶¶ 2, 46).

Similarly, in October 2025, Celsius Network LLC filed a lawsuit alleging that TrueCoin and certain affiliates misrepresented that foreign currency reserves backing tokens issued as part of TrueCoin's other stablecoin businesses were invested in cash, cash equivalents, or short-term securities, when in fact TrueCoin and FDT had knowingly or recklessly invested the reserves in a risky fund. (*See id.* ¶ 32, Exhibit V ¶ 81).

Also in October 2025, the DIFC court signaled agreement with several of Techteryx's central claims in proceedings brought by Techteryx against Aria DMCC to obtain a proprietary injunction and freezing order. Among other things, the court—in a 419-paragraph decision issued by Justice Michael Black, King's Counsel—observed that Brittain and his co-conspirators acted without Techteryx's knowledge or approval when they diverted $456 million in TUSD Reserves to Aria DMCC. (*See id.* ¶ 33, Exhibit W ¶ 209(11)). Justice Black further noted that the "monies were not used to invest in asset-backed, fully insured commodity trade finance transactions of short duration" (*see id.*); that the "factual analysis more than supports the conclusions that the manner in which the investment of the [$456 million] was made was highly irregular" (*see id.*, Exhibit W ¶ 359); that "there are serious issues to be tried as to whether the monies were diverted from [Aria CFF] to [Aria] DMCC in order to support liquidity within the Aria Group" (*id.*); that "[i]t

13

is possible to infer from the evidence" that "Messrs Brittain, Chok, [ADL] and [Sukonthabhund] did agree that all of the" TUSD Reserves at FDT "would be used to assist the Aria Group" (*see id.*, Exhibit W ¶ 361); that Brittain "produced documents to this Court that . . . do not constitute a truthful record of what occurred on their apparent dates" (*see id.*, Exhibit W ¶ 365); that "it is not easy to envisage an explanation of" the false December 2022 subscription documents "that is consistent with an honest explanation" (*id.*); that "there is considerable confusion as to the ownership of assets that seem to pass freely without formality between [Aria CFF] and [Aria] DMCC and [Brittain] is in control of both" (*see id.*, Exhibit W ¶ 409); that Brittain "gives every appearance of being the controlling mind of both entities" (*see id.*, Exhibit W ¶ 326); and that Brittain "appears to be the directing mind and will, signatory and ultimate beneficiary of every transaction undertaken by [Aria CFF] and [Aria] DMCC" (*see id.*, Exhibit W ¶ 318).  Moreover, in an earlier decision, Justice Black deemed it "seriously arguable that [Brittain] may be the directing mind and will of all the entities" within the three Aria corporate structures.  (*See id.*, Exhibit X ¶ 41 (internal quotations omitted)).

### H.   The Aria Entities Paid Others to Participate in the Fraud

The acts of TrueCoin, ADL, FDT, Chok, Finaport, and Sukonthabhund go beyond mere professional incompetence and show that they acted in concert with Brittain and the Aria entities to defraud Techteryx.  Techteryx has since learned that FDT and Finaport engaged in the scheme because Brittain secretly paid them handsomely through so-called "commissions" for directing the TUSD Reserves to the Aria entities.  (*See id.* ¶ 30).

14

Indeed, as noted, Brittain has admitted that FDT diverted $456 million of the TUSD Reserves to Aria DMCC to allow Brittain to more easily send secret "commissions" via Glass Door, which was related to FDT/Legacy, and is operated by Sukonthabhund. (*See id.*). Brittain has also confirmed under oath that the misdirection of the TUSD Reserves to Aria DMCC netted Glass Door commissions of at least $15.5 million. (*See id.*).

Upon information and belief, Glass Door, FDT, and/or Legacy then shared those commissions with others, including but not necessarily limited to TrueCoin, pursuant to a written agreement under which TrueCoin agreed to refer business to Legacy and assist Legacy in retaining such business. (*See id.*).

### I.      The Apparent Use of Techteryx's Investments to Pay Unrelated Debts and Make Risky Loans

Finally, Brittain and the Aria entities apparently used some of the misappropriated TUSD Reserves to satisfy unrelated debts and make risky loans. (*See id.* ¶ 34).

***First***, on or about April 30, 2019, Serica Finance plc ("Serica") issued senior secured rated notes with a one-year term (the "Serica Notes"), pursuant to an April 2019 investment memorandum. (*See id.* ¶ 35). The investment memorandum was issued by Aria Capital and designated Aria CFF as the recipient of the proceeds of the Serica Notes' issuance. (*See id.*). The memorandum claims that Aria CFF's commodity trade financing would generate income to repay the Serica Notes and identifies Walker as part of the commodities trading team. (*See id.*). The memorandum describes Aria CFF's trade financing activities and credit insurance in much the same terms as the May 2020 Private Placement Memorandum given to Techteryx. (*See id.*). According to Brittain, one of the

15

"significant" purchasers of the Serica Notes was CGS International Securities Singapore Pte. Ltd. ("CGS").  (*See id.*).

In May 2020—the same month Aria CFF issued its Private Placement Memorandum—Serica announced that the noteholders had approved extending the maturity of the Serica Notes from May 2020 to May 2021.  (*See id.* ¶ 36).  In August 2020, Serica announced that it would not make an interest payment to the holders of the Serica Notes because Aria CFF had failed to make payments under the Notes' terms.  (*See id.*).

Around June and December 2020, TrueCoin invested at least $97 million of the TUSD Reserves in Aria CFF.  (*See id.* ¶ 14).  Based on the timing of this investment and Brittain's documented disregard for corporate formalities, upon information and belief, Aria CFF then used the investment from the TUSD Reserves to repay the holders of the Serica Notes (including CGS) when the Serica Notes matured in May 2021.  (*See id.* ¶ 37). In other words, the infusion of TUSD Reserves into Aria CFF provided the very liquidity Aria CFF needed to satisfy its obligations on the Serica Notes as they came due.

*Second*, in December 2020, Aria CFF (K1) Fund Segregated Portfolio (which was the only segregated portfolio of ARIA Commodity Finance Funds (K) SPC, a Cayman Islands registered mutual fund also controlled by Brittain) issued a fixed rate note to Overseas-Chinese Banking Corporation Limited ("OCBC") with an issue price of $3.7 million and a maturity date of December 20, 2021 (the "Aria Note").  (*See id.* ¶ 38). On December 23, 2020, OCBC in turn issued credit-linked notes with a term of one year (the "OCBC Notes") under a December 18, 2020 term sheet.  (*See id.*).  The OCBC Notes were linked to the credit of Aria Commodity Finance Funds (K) SPC.  (*See id.*).

16

Between May and August 2021, $268 million of the TUSD Reserves were unlawfully diverted to Aria DMCC. (*See id.* ¶ 18). Again, based on the timing of the misappropriation of the TUSD Reserves and Brittain's disregard of corporate formalities, upon information and belief, a portion of the misappropriated TUSD Reserves were used to repay the Aria Note upon maturity in December 2021. (*See id.* ¶ 41).

*Third*, on or about November 22, 2022, Aria CFF and Aria DMCC entered into loan agreements with Carbon Resilience Pte. Ltd. ("Carbon Resilience"), pursuant to which they would loan the sum of $18 million to Carbon Resilience (comprising $8 million from Aria CFF and $10 million from Aria DMCC) (the "Carbon Resilience Loans") for the purported purpose of acquiring wind and solar assets in Queensland, Australia through Carbon Resilience (Australia) Pte. Ltd. ("Carbon Resilience Australia"). (*See id.* ¶ 40). According to Brittain, Aria CFF—through its nominee FA SPC Real Asset Income Limited—is the ultimate beneficial owner of Carbon Resilience. (*See id.* ¶ 40). Brittain has admitted under oath in the Dubai court proceeding that a portion of the misappropriated TUSD Reserves was used to fund the Carbon Resilience Loans. (*See id.* ¶ 41).

## J.    Techteryx's Anticipated Singapore Litigations

As discussed above, Techteryx expects to file litigation in Singapore against CGS, OCBC, Carbon Resilience, and Carbon Resilience Australia. (*See* March 30, 2026 Declaration of Benson Lim ("Lim Decl.") ¶ 7). The preparation of the Singapore Litigations is well underway, and Techteryx expects those proceedings to begin in the near term. (*See id.*).

17

Techteryx plans to assert claims that include dishonest assistance, knowing receipt, and unlawful means conspiracy. (*See id.*). Those claims allow a victim of a breach of trust or fiduciary duty (such as Techteryx) to seek compensation from a third-party that benefited from, or facilitated, the breach. (*See id.* ¶¶ 8-11). Dishonest assistance occurs when a third-party (like CGS, OCBC, Carbon Resilience, or Carbon Resilience Australia) assists a wrongdoer in a breach of trust or a fiduciary relationship. (*See id.* ¶ 8). A failure to ask questions when suspicious circumstances arise may constitute "dishonesty," and "assistance" can include actions or omissions that helped the fiduciary breach its duty. (*See id.* ¶ 9). A claim for knowing receipt allows a victim to sue a third-party if the third-party receives assets that the third-party knows are ill-gotten property originating from a breach of trust or fiduciary duty. (*See id.* ¶ 10). A claim for unlawful means conspiracy allows a victim to sue the conspirators involved in a fraudulent scheme (such as the misappropriation of the TUSD Reserves). (*See id.* ¶ 11).

To support its claims, Techteryx plans to allege that (1) Brittain, TrueCoin, FDT, Finaport, and others habitually disregarded the Aria entities' corporate formalities, arbitrarily shifted funds among those entities to suit their own needs, and diverted investors' money for unauthorized purposes; (2) CGS and OCBC knew, or should have known, about those practices had they exercised their required due diligence in a proper manner; and (3) Carbon Resilience and Carbon Resilience Australia knew of those practices, as both entities are ultimately controlled by Brittain, and they carried out acts and omissions in furtherance of the unlawful means conspiracy. (*See id.* ¶ 12).

18

Respondents' information about the misappropriation of the TUSD Reserves will thus be highly relevant to Techteryx's claims.  (*See id.*).

### III.    ARGUMENT

Techteryx seeks an order under Section 1782 authorizing it to serve the Subpoenas on Respondents.  That relief is proper because (1) Techteryx meets the three requirements set forth in Section 1782, and (2) the *Intel* factors weigh in favor of granting the application.

### A.    Techteryx's Application Satisfies Section 1782's Statutory Factors

Section 1782 allows a district court to order a respondent to give "his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal."  28 U.S.C. § 1782(a).  Applicants must show that "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person."  *In re Request for Int'l Jud. Assistance from the Norrkoping Dist. Ct., Sweden*, 219 F. Supp. 3d 1061, 1062 (D. Colo. 2015) ("*Norrkoping*") (internal citation and quotations omitted).  Techteryx's application satisfies all three requirements.

### 1.    Respondents Are Found in This District

Respondents are "found" in this District.  Both of the Aria USA Entities have their principal place of business at an address in Edmond, Oklahoma, which is within this District.  *See In re Fialdini*, 2021 WL 411105, at *4 (D. Colo. Feb. 5, 2021) (for purposes of Section 1782, businesses reside where they are incorporated or have their principal place

of business).  Walker lists the same address as his own.  *See Municipality of Mariana*, 713 F. Supp. 3d 1125, 1130 & n.2 (D.N.M. 2024) ("*Mariana*").

### 2.    The Discovery Sought Is "For Use" in Foreign Proceedings

Techteryx seeks discovery for use in foreign proceedings, namely, the Singapore Litigations, which will be filed in the General Division of the High Court of the Republic of Singapore.  That court is a "foreign tribunal" under Section 1782.  *See In re Sri Trang Gloves (Thailand) Pub. Co. Ltd.*, 2025 WL 2411137, at *2 (S.D.N.Y. Aug. 20, 2025); *In re Third Eye Cap. Corp.*, 2022 WL 714758, at *1, *3 (D.N.J. Mar. 10, 2022).

There is no requirement that a foreign proceeding be pending for Section 1782 discovery to proceed.  Rather, a foreign proceeding need only be "within reasonable contemplation." *Intel*, 542 U.S. at 259; *accord Salt Mobile S.A.* v. *Liberty Glob. Inc.*, 2021 WL 2375864, at *2 (D. Colo. June 10, 2021).  Courts have found this element satisfied even where the filing of the foreign proceeding hinged on first obtaining discovery under Section 1782.  *See Deloraze Ltd.* v. *Shimogori*, 2025 WL 1000034, at *2 (E.D. Cal. Apr. 3, 2025) (requested discovery was "for use" in foreign proceeding where applicant was "awaiting the discovery sought in this [Section 1782] application in order to ensure it [could] meet certain pleading requirements under UK law"), *report and recommendation adopted*, 2025 WL 1319035 (E.D. Cal. May 7, 2025).

Here, the Singapore Litigations are reasonably contemplated.  Techteryx has retained Singaporean counsel, which is preparing pleadings and plans to initiate the court proceedings in the near term.  Further, Respondents "likely ha[ve] probative information" for the Singapore Litigations.  *Mariana*, 713 F. Supp. 3d at 1130.

20

### 3.  Techteryx Is an "Interested Person" Under Section 1782

As the claimant in the Singapore Litigations, Techteryx is an "interested person." *See Westjet Airlines, Ltd.* v. *Lipsman*, 2015 WL 7253043, at \*2 (D. Colo. Nov. 17, 2015).

### B.  All Discretionary *Intel* Factors Favor Permitting the Discovery Techteryx Seeks

In *Intel*, the Supreme Court identified four additional discretionary factors to consider when determining whether to grant Section 1782 discovery.  542 U.S. at 264-65. Courts have summarized those factors as: "(1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the receptivity of the foreign tribunal to federal-court assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions; and (4) whether the request is unduly intrusive or burdensome." *Interbrew Cent. Eur. Holding BV* v. *Molson Coors Brewing Co.*, 2013 WL 5567504, at \*2 (D. Colo. Oct. 9, 2013).  All four factors favor Techteryx here.

### 1.  The Evidence Sought by Techteryx Will Not Be Available in the Singapore Litigations or Obtainable by Other Means

The Supreme Court has noted that "when the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad," since "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Intel*, 542 U.S. at 264.  Accordingly, when the person from whom discovery is sought is ***not*** a participant in the foreign proceeding, this factor weighs in favor of granting Section 1782 discovery.

21

Here, Techteryx does not anticipate naming Respondents as defendants in the Singapore Litigations.  (*See* Lim Decl. ¶¶ 14-15).  Therefore, the first *Intel* factor favors Techteryx.  *See Norrkoping*, 219 F. Supp. 3d at 1062; *Mariana*, 713 F. Supp. 3d at 1131.

### 2.    Singapore Courts Are Receptive to Section 1782 Discovery

The second *Intel* factor looks to "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance."  *Intel*, 542 U.S. at 264. "[W]hen evaluating whether foreign tribunals would accept U.S. assistance, courts look for authoritative proof that a foreign tribunal would reject evidence obtained with the aid of [S]ection 1782."  *Amgen Inc.* v. *Hill*, 2015 WL 1401237, at *4 (D. Utah Mar. 25, 2015) (internal quotations omitted).

This factor weighs in Techteryx's favor.  (*See* Lim Decl. ¶¶ 16-18).  It is well established that the Singapore courts are "receptive to Section 1782 discovery."  *In re Batbold*, 2021 WL 4596536, at *4 (S.D.N.Y. Oct. 6, 2021), *objections overruled*, 2023 WL 2088524 (S.D.N.Y. Feb. 17, 2023); *see also In re Sri Trang*, 2025 WL 2411137, at *2; *cf. In re Ex Parte Application of Regeneron Pharms., Inc.*, 2025 WL 2338037, at *2 (D. Del. Aug. 13, 2025) (Singapore courts' receptivity to Section 1782 discovery not disputed).

### 3.    Techteryx's Application Is Not an Attempt to Circumvent Singaporean Proof-Gathering Restrictions

The third *Intel* factor looks to whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States."  *Intel*, 542 U.S. at 265.  Here, "there is nothing to suggest that [Techteryx]

22

is attempting to circumvent foreign proof-gathering restrictions." *In re Hattori*, 2021 WL 4804375, at *4 (N.D. Cal. Oct. 14, 2021) (internal quotations omitted).

There are no such restrictions at issue—no Singaporean law, rule, or order would limit the discovery Techteryx seeks. (*See* Lim Decl. ¶ 16). *See also In re Application of Savan Magic Ltd.*, 2017 WL 6454240, at *4 (D. Nev. Dec. 18, 2017) ("Respondent has not identified any adverse discovery order issued in the underlying action or any Singaporean discovery rule imposing a proof-gathering restriction."). Rather, Singaporean courts are receptive to Section 1782 discovery. (*See* Lim Decl. ¶ 18).

### 4.    The Requests Are Narrowly Tailored

Finally, the fourth *Intel* factor looks to whether the discovery sought is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. Here, the Subpoenas are narrowly tailored to seek evidence relevant to the Singapore Litigations. Techteryx plans to bring claims for dishonest assistance, knowing receipt, and unlawful means conspiracy, each premised on Brittain's, TrueCoin's, FDT's, and Finaport's (as well as their representatives' and other co-conspirators') breaches of trust and fiduciary duty concerning the TUSD Reserves, and on the Aria entities' disregard of corporate formalities in shifting funds between those entities. Although Respondents are not themselves anticipated defendants in the Singapore Litigations, all three are believed to possess knowledge and/or have custody or control over evidence relevant to the dispute. *See*, *e.g.*, 28 U.S.C. § 1782(a) (discovery under Section 1782 generally proceeds in "accordance with the Federal Rules of Civil Procedure"); *ACE Oilfield Rentals, LLC* v. *W. Dakota Welding & Fabrication, LLC*, 2021 WL 4270026, at *1 (W.D. Okla. Aug. 19, 2021) ("possession, custody, or

23

control" under Fed. R. Civ. P. 34(a) includes "the practical ability to obtain the documents from another" (quotations omitted)); *Gonzalez* v. *Verfruco Foods, Inc.*, 2023 WL 1794391, at \*3-4 (11th Cir. Feb. 7, 2023) (interrelationship with foreign affiliates supported Section 1782 order directing U.S. entity to produce materials in foreign affiliates' possession).

Here, all three Respondents played integral roles in the misappropriation of the TUSD Reserves and dispersal of the funds across the Aria entities, which, upon information and belief, used the funds to repay holders of the Serica and Aria Notes, including CGS and OCBC.  The Aria USA Entities received up to $200 million of misappropriated TUSD Reserves from Aria DMCC, and Walker is the only member who owns 5% or more of the Aria USA Entities.  In addition, Walker signed documents relevant to the TUSD Reserves on behalf of Aria DMCC and Aria AAAX, and was listed as part of Aria CFF's commodities trading team in the Serica Notes investment memorandum.

Techteryx is thus entitled to discovery regarding the aforementioned allegations, including the lack of corporate formalities among the Aria entities, the misappropriation of the TUSD Reserves, and the use of those funds to repay unrelated obligations (such as the Serica and Aria Notes) and to provide loans for long-term and illiquid investments (such as the Carbon Resilience Loans).  Specifically, the Requests seek documents and testimony related to (1) the Aria USA Entities' and Walker's involvement with the Serica, Aria, and OCBC Notes; (2) the Aria USA Entities' and Walker's involvement with the Carbon Resilience Loans; (3) the source of funds used to repay the Serica and Aria Notes; (4) the flow of funds (including transfers between the Aria USA Entities and other Aria entities) of the TUSD Reserve investments; (5) the relationship between the Aria USA Entities and

24

the other participants in the fraudulent scheme (*e.g.*, FDT, Legacy, Crossbridge, Finaport, and Glass Door); (6) any payments made by any of the Aria entities to the other participants in the fraudulent scheme; and (7) the corporate structure of the Aria entities involved in the fraudulent scheme.   (*See* Lim Decl. ¶ 19).   In sum, Techteryx seeks documents, instructions, and other information showing the flow of misappropriated TUSD Reserves among the Aria USA Entities, other Aria entities, and other participants in the fraudulent scheme, including for purposes of financing the Serica Notes, Aria Note, and Carbon Resilience Loans.  (*See id.* ¶ 20).  The scope of this discovery is no broader than necessary to support Techteryx's claims in the Singapore Litigations.  (*See id.*).

Moreover, Techteryx has tailored the timeframe for which it seeks information—April 1, 2019, through the present—to its claims.  These dates are relevant because the Serica Notes were issued pursuant to an April 2019 investment memorandum; the Aria Note was issued in December 2020 and the OCBC Notes were issued under a December 2020 term sheet; the misuse of the TUSD Reserves by the Aria entities occurred between July 2020 and March 2022; the Serica and Aria Notes were repaid in May 2021 and December 2021, respectively; the loan agreements pursuant to which the Carbon Resilience Loans were made were dated November 22, 2022; and to this day, it remains unclear where the Aria entities (including the Aria USA Entities) and Brittain ultimately sent the enormous sums—exceeding $500 million—still owed to Techteryx.

## IV.    CONCLUSION

Techteryx respectfully requests that the Court enter an order authorizing Techteryx to issue the Subpoenas upon Respondents pursuant to 28 U.S.C. § 1782.

DATED: March 31, 2026.

/s/ Jared D. Giddens
Jared D. Giddens, OBA No. 3355
J. Dillon Curran, OBA No. 19442
Matthew A. Peace, OBA No. 35707

Of the Firm:
CONNER & WINTERS, LLP
211 N. Robinson Ave., Ste. 1700
Oklahoma City, OK 73102
Telephone: (405) 272-5711
Facsimile: (405) 232-2695
jgiddens@cwlaw.com
dcurran@cwlaw.com
mpeace@cwlaw.com

-and-

Samson A. Enzer*
John S. MacGregor*
Andrew W. Amend*
Frederick J. Glasgow*
Gregory Mortenson*
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
(212) 701-3000
senzer@cahill.com
jmacgregor@cahill.com
aamend@cahill.com
fglasgow@cahill.com
gmortenson@cahill.com

**Attorneys for Applicant Techteryx Ltd.**
*Pro hac vice* forthcoming

26