

# INVESTMENT MEMORANDUM

EUR 200,000,000 Series 2019-CFF1 5.50% Senior Secured Rated Notes and 7.00% USD Senior Secured Rated Notes

Relating to the Issuer's EUR 8,000,000,000 Secured Medium Term Note Programme

Exhibit LJ7 / Page 161

Exhibit "25"
Page 1 of 40

This Investment Memorandum has been prepared for information purposes only and is not, nor is it intended to be, a Prospectus for the purposes of Section 85 of the the the Financial Services and Markets Act 2000 ("FSMA") or to constitute an offer to the public of any kind. This Investment Memorandum has not been approved by an authorised person for the purposes of Section 21 of FSMA, and is exempt from such by section 86(1)(c) Prospectus Directive Amending Directive (2010/73/EU). In particular, this Investment Memorandum is not an "offer of Notes to the public" pursuant to Directive 2003/71/EC (and amendments thereto) (the "Prospectus Directive").

## Important Notice to Investors

THIS MEMORANDUM IS INTENDED FOR DISTRIBUTION SOLELY TO QUALIFIED INVESTORS SUCH AS PROFESSIONAL CLIENTS AND ELIGIBLE COUNTERPARTIES. THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.

IMPORTANT: You must read the following before continuing. The following applies to the Investment Memorandum attached to this electronic transmission, and you are therefore advised to read this carefully before reading, accessing or making any other use of the Investment Memorandum. In accessing the Investment Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access. If you are resident in the UK and in any doubt about the contents of this Information Memorandum, we strongly recommend that you should consult and seek advice from an authorised person who specialises in advising on the acquisition of securities and is authorised under FSMA. An investment in Serica Finance Plc will not be suitable for all recipients of this Investment Memorandum.

Not for distribution to any U.S. person or to any person or address in the U.S.
NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES OF THE ISSUER FOR SALE IN THE UNITED STATES OR ANY OTHER JURISDICTION WHERE IT IS UNLAWFUL TO DO SO OR TO ANY PERSON IN ANY JURISDICTION TO WHOM IT IS UNLAWFUL TO MAKE SUCH AN OFFER. THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER JURISDICTION AND THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) EXCEPT PURSUANT TO AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS  NOR MAY THE SECURITIES BE OFFERED OR SOLD DIRECTLY OR INDIRECTLY IN OR INTO CANADA, AUSTRALIA, NEW ZEALAND, JAPAN OR THE REPUBLIC OF SOUTH AFRICA. THE FOLLOWING INVESTMENT MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER, AND IN PARTICULAR, MAY NOT BE FORWARDED TO ANY U.S. PERSON OR TO ANY NATIONAL, RESIDENT OR CITIZEN OF CANADA, AUSTRALIA, NEW ZEALAND, JAPAN OR THE REPUBLIC OF SOUTH AFRICA. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORISED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

You are reminded that the Investment Memorandum has been delivered to you on the basis that you are a person into whose possession the Investment Memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorised to, deliver the Investment Memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the Servicer or any affiliate of the Servicer is a licensed broker or dealer in that jurisdiction, the offering shall be deemed to be made by the Servicer or such affiliate on behalf of the Issuer in such jurisdiction.

By accessing the Investment Memorandum, you shall be deemed to have confirmed and represented to us that (a) you have understood and agree to the terms set out herein, (b) you consent to delivery of the document by electronic transmission and (c) you are not a U.S. person (within the meaning of Regulation S under the Securities Act) or acting for the account or benefit of a U.S. person and the electronic mail address that you have given to us and to which this e-mail has been delivered is not located in the United States, its territories and possessions (including Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, Wake Island and the Northern Mariana Islands) or the District of Columbia.

Any recipient of this Investment Memorandum outside of the UK should inform themselves about and observe any applicable legal requirements.

In the United Kingdom, this document is being distributed only to, and is directed only at, and any offer subsequently made may only be directed at, persons: (i) who have professional experience in matters relating to investments and fall within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended (the "FPO") and/or (ii) who are persons falling within Article 49(2)(a) to (d) of the FPO ("high net worth companies, unincorporated associations etc.") (all such persons together being referred to as "relevant persons"). This document must not be acted on or relied on in the United Kingdom by persons who are not relevant persons. In the United Kingdom, any investment or investment activity to which this document relates is only available to, and will only be engaged in with, relevant persons. If contrary to the above you are not a relevant person but you are in receipt of this Investment Memorandum, then you must seek suitable financial advice before investing, to ascertain and understand the full risks and terms associated with any investment, and any such investment must be made through a professional Pension Trustee firm and/or Life Insurance policy/bond.

INVESTMENT MEMORANDUM ————————————————————————— **Exhibit LJ7 / Page 162**

Exhibit "25"
Page 2 of 40

This Investment Memorandum has been sent to you in an electronic form. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission and consequently none of the Issuer, nor the Servicer, nor the other transaction parties or any person who controls any such person or any director, officer, employee or agent of any such person (or affiliate of any such person) accepts any liability or responsibility whatsoever in respect of any difference between the Investment Memorandum distributed to you in electronic format and the hard copy version available to you on request from the Issuer or the Servicer.

The Issuer accepts responsibility for the information contained in the Sections "Key Facts", "Transaction Parties", "Investment Structure", "Risk Factors", Principal Documents", "Pricing Supplement", "Terms and Conditions of the Notes" and "General Information" of this Investment Memorandum, and the Promoter accepts responsibility for the information contained in the Sections "Market Opportunity" and "References" of this Investment Memorandum; each declares that, having taken all reasonable care to ensure that such is the case, the information contained in the relevant Sections of this Investment Memorandum is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

Series 2019-CFF1 Notes will be issued on the terms set out herein under "Terms and Conditions of the Series 2019-CFF1 Notes" (the "Conditions") as completed by a document specific to such Series 2019-CFF1 Notes called the Pricing Supplement (the "Pricing Supplement"). No person has been authorised to give any information or to make any representation not contained in or not consistent with this Investment Memorandum or any other document entered into in relation to the Programme (as defined below) or any information supplied by the Issuer or such other information as is in the public domain and, if given or made, such information or representation should not be relied upon as having been authorised by the Issuer, the Note Trustee or the Promoter.

The distribution of this Investment Memorandum and the offering, sale and delivery of the Series 2019-CFF1 Notes in certain jurisdictions may be restricted by law. Persons into whose possession this Investment Memorandum comes are required by the Issuer and the Promoter to inform themselves about and to observe any such restrictions. In particular, the Series 2019- CFF1 Notes have not been and will not be registered under the Securities Act of 1933 and are subject to U.S. tax law requirements. Subject to certain exceptions, Series 2019-CFF1 Notes may not be offered, sold or delivered within the United States or to U.S. persons.

This Investment Memorandum does not comprise a Prospectus for the purposes of Section 85 FSMA. This Investment Memorandum has not been approved by an authorised person for the purposes of Section 21 of FSMA and is exempt from such by section 86(1)(c) Prospectus Directive Amending Directive (2010/73/EU). The Notes are denominated in units of EUR100,000 or USD 100,000 each, and are restricted to a minimum subscription of one EUR100,000 or USD 100,000 Note, with any multiples of EUR or USD 1,000 units above that available, up to the maximum amount under Series 2019-CFF1.

This Investment Memorandum does not constitute an offer or an invitation to subscribe for or purchase any Series 2019-CFF1 Notes and should not be considered as a recommendation by the Issuer, the Promoter, the Note Trustee, or any of them that any recipient of this Investment Memorandum should subscribe for or purchase any Series 2019-CFF1 Notes. Each recipient of this Investment Memorandum shall be taken to have made its own investigation and appraisal of the condition (financial or otherwise) of the Issuer.

In this Investment Memorandum, unless otherwise specified, references to a "Member State" are references to a Member State of the European Economic Area, references to "pounds sterling", "sterling" and "£" are to the lawful currency of the United Kingdom, references to "U.S.$", "U.S. dollars" or "dollars" are to United States dollars and references to "EUR", "€" or "euro" are to the single currency introduced at the start of the third stage of European economic and monetary union, and as defined in Article 2 of Council Regulation (EC) No. 974/98 of 3 May 1998 on the introduction of the euro as amended.

Certain figures included in this Investment Memorandum have been subject to rounding adjustments; accordingly, figures shown for the same category presented in different tables may vary slightly and figures shown as totals in certain tables may not be an arithmetic aggregation of the figures which precede them.

The Issuer is a vehicle specifically set up to issue debt and is bankruptcy remote, in order to divorce the risk of the borrower from the risk of the bond issuer by isolating financial risk, minimizing bankruptcy risk, ringfencing assets therefore eliminating noteholder financial exposure to the Borrower.

### Regarding Forward-Looking Statements
This Investment Memorandum contains forward-looking statements. Forward-looking statements often include words such as "anticipate", "expect", "intend", "plan", "believe", "continue" or similar words in connection with discussions of future operating or financial performance. The forward-looking statements are based on the directors' and where relevant the Issuer's current expectations and assumptions regarding commercial performance, the economy and other future conditions, circumstances and results. As with any projection or forecast, forward-looking statements are inherently susceptible to uncertainty and changes in circumstances. The actual results may vary materially from those expressed or implied in its forward-looking.

### Own Investigation
This Investment Memorandum does not take into account the individual objectives, financial situation or needs of any recipient and each recipient should conduct their own due diligence. Recipients of this Investment Memorandum should pay particular attention to the information relating to risk factors.

INVESTMENT MEMORANDUM ──────────────────────── **Exhibit LJ7 / Page 163**

PROSPECTIVE INVESTORS SHOULD HAVE REGARD TO THE RISK FACTORS DESCRIBED UNDER THE SECTION HEADED 'RISK FACTORS' IN THIS INVESTMENT MEMORANDUM. NO ASSURANCE CAN BE GIVEN THAT THE COMPANY'S OBJECTIVES WILL BE ACHIEVED.

The Series 2019-CFF1 Notes may not be a suitable investment for all investors. Each potential investor in the Series 2019-CFF 1 Notes must determine the suitability of that investment in light of its own circumstances. In particular, each potential investor may wish to consider, either on its own or with the help of its financial and other professional advisers, whether it:

i.      Has sufficient knowledge and experience to make a meaningful evaluation of the Series 2019-CFF1 Notes, the merits and risks of investing in the Series 2019-CFF1 Notes and the information contained or incorporated by reference in this Investment Memorandum or any applicable supplement;

ii.     Has access to, and knowledge of, appropriate analytical tools to evaluate, in the context of its particular financial situation, an investment in the Series 2019-CFF1 Notes and the impact the Series 2019-CFF1 Notes will have on its overall investment portfolio;

iii.    Has sufficient financial resources and liquidity to bear all of the risks of an investment in the Series 2019-CFF1 Notes, including Series 2019-CFF1 Notes where the currency for principal payments is different from the potential investor's currency;

iv.     Understands thoroughly the terms of the Series 2019-CFF1 Notes and is familiar with the behaviour of financial markets; and

v.      Is able to evaluate possible scenarios for economic, interest rate and other factors that may affect its investment and its ability to bear the applicable risks.

Legal investment considerations may restrict certain investments. The investment activities of certain investors are subject to legal investment laws and regulations, or review or regulation by certain authorities. Each potential investor should consult its legal advisors to determine whether and to what extent (1) Series 2019-CFF1 Notes are legal investments for it, (2) Series 2019- CFF 1 Notes can be used as collateral for various types of borrowing and (3) other restrictions apply to its purchase or pledge of Series 2019-CFF1 Notes. Financial institutions should consult their legal advisors or the appropriate regulators to determine the appropriate treatment of the Series 2019-CFF1 Notes under any applicable risk-based capital or similar rules.

**Risks**
It is intended to apply for the Notes to be admitted to trading on the Frankfurt Stock Exchange. There is no guarantee that such application will be successful or that the Notes will be admitted to trading on any market. There is no assurance that can be given as to the liquidity of the Notes in any after- market.

## SERICA FINANCE PLC

**(incorporated with limited liability in England and Wales with registered number 11473247)**

ISSUE OF UP TO

**EUR200,000,000 Secured Notes 5.50% EUR due April 2020 (Series 2019-CFF1) ISIN: GB00BJRF9H03**
**SEDOL: BJRF9H0 / OPOL: XFRA (Frankfurt)**

**US$200,000,000 Secured Notes 7.00% due April 2020 (Series 2019-CFF1) ISIN: GB00BJQ31240**
**SEDOL: BJQ3124 / OPOL: XFRA (Frankfurt)**

**Under the EUR 8,000,000,000 Secured Medium Term Note Programme**

**Issue Price: 100%**

This Issuer has prepared listing particulars dated 14 April 2019 (the "Listing Particulars") in compliance with the Listing Rules of Frankfurt Stock Exchange (Open Market (Freiverkehr). Application will be made to Frankfurt Stock Exchange (Open Market (Freiverkehr) for the approval of securities (the "Securities") issued by the Issuer under the EUR 8,000,000,000 Secured Medium Term Note Programme (the "Programme") to be admitted to listing and trading on the Frankfurt Stock Exchange (Open Market (Freiverkehr). References in this Investment Memorandum to the Series 2019-CFF1 Notes being "listed" (and all related references) shall mean that the Series 2019-CFF1 Notes are admitted to the Frankfurt Stock Exchange (Open Market (Freiverkehr).

Serica Capital PLC will issue up to EUR200,000,000 Secured Notes 5.50% due 2020 and USD Secured Notes 7.00% (the "Series 2019-CFF1 Notes") under the Programme. This Investment Memorandum is qualified in its entirety by the Listing Particulars and the Pricing Supplement. Words and expressions defined in the Listing Particulars shall have the same meanings herein.

The Series 2019-CFF1 Notes will be authorised by the Board of Directors of the Issuer to be deposited with Euroclear UK & Ireland Limited on or prior to the closing date in accordance with the Uncertificated Securities Regulations 2001 (SI2001 No. 3755) including any modification thereof for the time being in force (the "CREST Regulations") and the rules, regulations, procedures, facilities and requirements as defined in the CREST Regulations. The register of the Series 2019-CFF1 Notes shall be maintained at all times in the United Kingdom by the Registrar where title is recorded as being held in uncertificated form. The Series 2019-CFF1 Notes may be transferred by means of the Relevant System (as defined in the CREST Regulations).

ARIA Capital Management is an asset manager which has six offices globally including the UK, Hong Kong, Switzerland, Malta, Dubai and Cayman Islands, and is regulated by the FCA, MFSA, CIMA, HKCIB and ESCA.

ARIA Capital Management, a company incorporated in Cayman Islands, with company number 1088974 and having its registered address at Governors Square, 2nd Floor, 23 Lime Tree Bay, PO Box 1569, Grand Cayman KY1-1110 Cayman Islands which, is a Cayman Limited Liability Company, registration number CM-278308, is the Promoter of the Notes (the "Promoter") and the Receivables Administrator to the Borrower.

ARIA Commodity Finance Fund, a company incorporated in the Cayman Islands, with company number IM-313263 and having its registered address at 3rd Floor Harbour Centre, P.O. Box 61 George Town, Grand Cayman KY1-1102 Cayman Islands, and listed on Frankfurt Stock Exchange (Open Market (Freiverkehr), is a Loan Receivables Originator (the "Originator").

This Investment Memorandum is provided in confidence only to: (a) persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended (the "Order") and/or (b) high net worth companies (or persons to whom it may otherwise be lawfully communicated) falling within Article 49(2)(a) to (d) of the Order and/or (c) persons who otherwise fall within an exemption set forth in the Order so that section 21(1) of the Financial Services and Markets Act 2000 does not apply to the Issuer and/or (d) a person to whom this Memorandum can be sent lawfully in accordance with all other applicable securities laws. If this is not the case then you must return this Investment Memorandum immediately. It is not directed at and may not be acted on by anyone else.

If contrary you are not a relevant person (as defined above) but you are in receipt of this Investment Memorandum, then you must seek suitable financial advice before investing, to ascertain and understand the full risks and terms associated with any investment, and any such investment must be made through a professional Pension Trustee firm and/or Life Insurance policy/bond.

No derivatives are used by the Series 2019-CFF1 Notes and investors are not exposed to any complex or sophisticated financial instruments. The Series 2019-CFF1 Notes are not sophisticated or complex products and include no embedded derivatives which may otherwise give rise to such classification.

Investing in the Series 2019-CFF1 Notes involves certain risks. The principal risk factors that may affect the ability of the Issuer and the Borrower to fulfil their respective obligations are only summarised below; reference should be made to the "Risk Factors" in the Listing Particulars.

14 April 2019.

INVESTMENT MEMORANDUM ———————————————————— **Exhibit LJ7 / Page 165**

## Contents

|  | Page |
|---|---|
| Important Notices | 2 |
| Contents | 6 |
| Key Facts | 7 |
| Transaction Parties | 8 |
| Investment Structure | 9 |
| Trade Finance and Transaction Overview | 12 |
| Market Opportunity | 16 |
| Credit Support Providers, Credit Enhancements and Credit Protection | 17 |
| Risk Management | 18 |
| Commodity Trading Advisors | 22 |
| Relevant Definitions | 24 |
| Risk Factors | 28 |
| Principal Documents | 32 |
| Pricing Supplements (EUR) | 33 |
| Pricing Supplements (USD) | 36 |
| General information | 39 |
| Transaction Parties | 40 |

INVESTMENT MEMORANDUM

Exhibit LJ7 / Page 166

## Key Facts

**Rated Series – 2019-CFF1**

| | |
|---|---|
| ISIN number | EUR: GB00BJRF9H03<br>USD: GB00BJQ31240 |
| SEDOL | EUR: SEDOL: BJRF9H0 / OPOL: XFRA<br>USD: SEDOL: BJQ3124 / OPOL: XFRA |
| Currency | EUR/USD |
| Issue size | Up to EUR 200,000,000 / USD 200,000,000 |
| Target Asset Allocation | 100% Commodity Trade Finance Transactions |
| Status | Senior Secured Debt under English Law |
| Instrument Credit Rating | N/A |
| Credit Support Provider | Listed financial institutions if and for so long as it has a rating of A- or higher (by S&P or Fitch) or A3 or higher (by Moody's) |
| Credit Protection Provider | AIG or other Provider if and for so long as it has a rating of A- or higher (by S&P or Fitch) or A3 or higher (by Moody's) |
| Coupon | EUR 5.50% / USD 7.00% p.a. paid quarterly in (first payment after 3 months) |
| Term | 1-year investment term |
| Listing | Frankfurt Stock Exchange (Open Market (Freiverkehr) |
| Liquidity | Freely transferable subject to relevant exchange rules |
| Issue Date | 30 April 2019 (EUR)/ 7 May 2019 (USD) |
| Bloomberg Pricing | FIGI number: BBG00P17Q6P8 |
| Clearing and Settlement | Crest, Euroclear, Clearstream |
| Issuer | Serica Finance PLC |
| Borrower | ARIA Commodity Finance Fund |
| Note Trustee and Issuer Security Trustee | GRM Law Trustees Limited |
| Transfer Agent, Registrar & Paying Agent | Avenir Registrars Limited |
| Servicer and Calculation Agent | Bedford Row Capital Advisers Limited |

INVESTMENT MEMORANDUM **Exhibit LJ7 / Page 167**

**Transaction Parties**

| | |
|---|---|
| Issuer | Serica Capital PLC, a public limited company incorporated and registered in England and Wales with registered number 11473247 whose registered office is at 1 Bedford Row, London, WC1R 4BZ. |
| Receivables Servicer | ARIA Capital Management Ltd, (the "Promoter") whose registered office is 3rd Floor Harbour Centre,  P.O. Box 61 George Town, Grand Cayman KY1-1102 Cayman Islands and other entities appointed from time to time. |
| Borrower | ARIA Commodity Finance Fund 3rd Floor Harbour Centre, P.O. Box 61 George Town, Grand Cayman KY1-1102 Cayman Islands |
| Note Trustee and Security Trustee | GRM Trustees Limited, a private limited company incorporated under the laws of England and    Wales with registered number 06171085 and with registered office at GRM Law Trustees Limited 1 Bedford Row London WC1R 4BZ will: (i) act as note trustee for and on behalf of the noteholders of the Programme (the "Note Trustee") pursuant to a trust deed dated on or around 14   April 2019 between the Issuer and the Note Trustee (the "Trust Deed") and a supplemental trust deed (the "Supplemental Trust Deed") to be entered into on or about the date of this Investment Memorandum between the Note Trustee and the Issuer; (ii) act as security trustee (the "Security Trustee") and hold on trust for itself and the other Issuer Secured Creditors the security granted by the Issuer pursuant to the Issuer Deed of Charge entered into on or about the date of this Investment Memorandum between the Issuer and the Security Trustee (the "Issuer Deed of Charge") |
| Transfer Agent, Registrar and Paying Agent | Avenir Registrars Limited, a limited company incorporated and registered in England and Wales with registered company number 09009850 whose registered office is at 5 St. John's Lane London EC1M  4BH will  act as  transfer  agent,  registrar  and  paying  agent  pursuant  to  the  Agency Agreement. |
| Calculation Agent | Bedford Row Capital Advisors Limited, whose registered address is at 1 Bedford Row,  London, WC1R 4BZ, will act as calculation agent (the "Calculation Agent") pursuant to a calculation agency agreement (the "Calculation Agency Services Agreement") to be entered into on the closing date between inter alia the Issuer and the Calculation Agent. The Calculation Agent, in relation to any determination or calculation specified in the Conditions of the Notes or the Loan Agreement, will act as calculation agent of the Issuer for the purpose of making such determinations or calculations in accordance with the Conditions and the Loan Agreement. |
| Promoter | ARIA Capital Management Ltd, (the "Promoter") whose registered office is 3rd Floor Harbour Centre,  P.O. Box 61 George Town, Grand Cayman KY1-1102 Cayman Islands pursuant to a distribution agreement between the Issuer and the Promoter (the "Distribution Agreement"). The Promoter will act as promoter pursuant to the Distribution Agreement. |

## Investment Structure

The below diagram represents the investment structure of the Series 2019-CFF1 Notes.



DIAGRAM 1: INVESTMENT STRUCTURE FOR SERICA FINANCE PLC– 1 YEAR NOTES AT 5.50% EUR P.A. DUE April 2020

The Issuer is a vehicle specifically set up to issue debt and is bankruptcy remote, in order to divorce the risk of the borrower from the risk of the bond issuer by isolating financial risk, minimising bankruptcy risk, ringfencing assets therefore eliminating noteholder financial exposure to the Borrower.

The following general description does not purport to be complete and is qualified in its entirety by the Pricing Supplement and the Listing Particulars.

An index of defined terms used in this Investment Memorandum appears at the end of this document.

Exhibit LJ7 / Page 169

## ISSUE OF THE SERIES 2019 CFF1 NOTES

The Issuer will issue the Series 2019-CFF1 Notes and lend the proceeds, in EUR and USD, (the "Secured Loan") directly to the Borrower pursuant to a loan agreement (the "Loan Agreement"), under which the Issuer will advance cash to the Borrower after deducting the costs and expenses of the relevant Notes issuance and depositing at least 1% of amounts utilised under the Loan Agreement (the "Liquidity Reserve") into the Reserves Account (for the Series 2019-CFF1).

### DEED OF CHARGE

The Notes are secured under the terms of a deed of charge dated on or around the closing date between the Issuer, and the Security Trustee (the "Issuer Deed of Charge"), details of which are summarised in the Listing Particulars. The Issuer Deed of Charge secures the obligations of the Issuer arising pursuant to the Series 2019-CFF1 Notes in favour of the Security Trustee by fixed charges over the Issuer's rights under the Transaction Documents to which it is a party, the Issuer's Accounts (including any interest accruing in those accounts) and a floating charge over all of the Issuer's other present and future business and undertaking and assets not charged under the fixed charges.

The Issuer Deed of Charge is governed by English Law and contains customary representations and warranties in favour of the Security Trustee. The Issuer cannot grant any security or assignment in respect of any of its assets without the prior written consent of the Security Trustee.

### INTEREST AND REDEMPTION

The Series 2019-CFF1 Notes will bear interest on their Outstanding Principal Amount from and including the Issue Date of the Series 2019-CFF1 EUR Notes at 5.50 per cent per annum and at 7.00 per cent per annum for the USD Notes, and such interest will be payable in EUR and US respectively, in arrears on each Note Interest Payment Date, subject to the applicable Priority of Payments.

The Note Interest Payment Date means 16 September 2019 (being the first Note Interest Payment Date) and, thereafter, quarterly on 16 March, 16 June, 16 September and 16 December in each year or, if any such date is not a Business Day, the next following Business Day unless such Business Day falls in the next calendar month, in which event, the immediately preceding Business Day.

The Series 2019-CFF1 Notes will be redeemed in full on the Maturity Date, being 30th April 2020.

### ISSUER COLLATERAL ACCOUNT

The Issuer will maintain a segregated account in its name designated as "2019-CFF1 Collateral Account" denominated in EUR and USD with Coutts Bank plc, 440 Strand, London, WC2R 0QS. Amounts held in the Collateral Account will form part of the security constituted by the Issuer Deed of Charge to secure the repayment of the Notes and related issuance expenses.

### ISSUER RESERVE ACCOUNT

The first loss provision is 5%, from a combination of provisioning on instalments, subordination of management fees and over-collateralisation. The coupon reserve is 1.5x the coupon coverage, which translates to 2.3% credit enhancement. The protection provided by the structure of the transaction is 2.7% when measured in terms of ARC Rating's expected loss rating methodology. The liquidity reserve is a minimum 3% of drawn capital, maintained in the Issuer Reserve Account.

### LOAN AGREEMENT

Under the loan agreement, the Issuer will make a secured loan (the "Secured Loan") to the Borrower to acquire assets fitting the Eligible Receivables Criteria. The Secured Loan will be secured on assets acquired by the Borrower by way of a charge over the Borrower's shares, a charge over the Borrower's bank, custody and trading accounts and a mortgage over the individual assets and Loan and Account receivables, specific to the 'Relevant Assets' of the Borrower, purchased with the proceeds of the Secured Loan, all governed by the laws of the United Kingdom and the Cayman Islands and as further detailed below.

The Loan Agreement will be governed by and enforceable under English law and contains customary representations and warranties from the Borrower to the Issuer, including representations and warranties as to the ownership by the Borrower of their assets, that there are no adverse claims against such assets, that the Borrower have complied with all relevant laws in respect of those assets and that the obligations created under the Secured Loan Agreement are enforceable. The principal value of all of the Account or Loan Receivables made by the Issuer may not exceed the net proceeds raised via the issue of the Series 2019- CFF1 Notes.

On the date of the Loan Agreement, the Secured Loan will be secured on a package of trade finance account and loan receivables security agreements, the Relevant Assets, governed by the laws of Cayman Islands.

1. A pledge over the Relevant Accounts dated on or around 14 April 2019 made between the Borrower (as pledgor) and the Issuer (as pledgee) (the "Borrower Account Pledge") in respect of the Borrower's bank accounts; and
2. A mortgage over the Relevant assets of the Borrower dated on or around 14 April 2019 granted by the Borrower (as mortgagor) in favour of the Issuer (as mortgagee) (the "Borrower Asset Mortgages") in respect of the assets of the Borrower purchased with the proceeds of the Secured Loan;
3. An undertaking from the shareholders of the Borrower to the Issuer to enter into a pledge over shares of the Borrower in favour of a security agent (for and on behalf of the Issuer) (the "Borrower Share Pledge"); and

INVESTMENT MEMORANDUM      **Exhibit LJ7 / Page 170**

**RATINGS**

ARC Ratings S.A. ("ARC Ratings") has assigned the Notes to be issued under the Programme an indicative rating of "A+SF", based on a sample set of Eligible Receivables that would form part of an Issuer's Series Assets if acquired by it. An obligation rated "ASF" is, based on ARC Ratings' ratings definitions, somewhat more susceptible to the adverse effects of changes in circumstances and economic conditions when compared to obligations in highest categories i.e. ratings of "AASF" or "AAASF". However, the obligor's capacity to meet its financial commitments on the obligation remains quite strong. A rating of "A+SF" would indicate that the obligation is of a higher standing relative to other obligations within the "ASF" category.

This indicative rating is not a final rating and each tranche (a "Tranche") of Notes issued under the Programme may be rated or unrated by any or all of ARC Ratings, Moody's Investors Service Ltd ("Moody's"), Fitch Ratings Limited ("Fitch") or Standard & Poor's Credit Market Services Europe Limited ("S&P"). Each of ARC Ratings, Moody's, Fitch, S&P and ARC Ratings is established in the European Economic Area and registered under Regulation (EC) No 1060/2009, as amended (the "CRA Regulation"). Where a Tranche of Notes is rated, such rating will not necessarily be the same as any rating(s) assigned to the Programme or to Notes already issued. The expected rating(s), if any, of a certain Series of Notes to be issued under the Programme will be specified in the relevant Final Terms. A rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time by the assigning rating agency.

## Trade Finance and Transaction Overview

The underlying assets that the Borrower will from time to time acquire are:

a.  Rights to payment under invoices issued by Commodity sellers (each a "Commodity Seller") to Commodity buyers (each a "Commodity Buyer") or, where such invoices have not been issued, rights to payment under contracts (each a "Commodity Contract") entered into between Commodity Sellers and Commodity Buyers in respect of Commodities (any such right in either case an "Account Receivable"); and/or

b.  Rights to payment under any loan agreements (each a "Trade Finance Loan Agreement") relating to any trade finance loans (each a "Trade Finance Loan") provided to Commodity Buyers or Commodity Sellers by the Loan Receivables Originator (as defined below) (any such right a "Loan Receivable").

A "Commodity" means any physical (typically agricultural), asset capable of being sold and purchased pursuant to a Commodity Contract including without limitation energy assets (excluding crude oil), hard assets (metals, minerals, mining products, etc.) and soft assets (agricultural products, etc.), and any other physical asset, in each case whether in the form of raw materials, or semi-finished or finished goods.

An Account Receivable or Loan Receivable (each a "Trade Finance Receivable") will in each case be acquired by the Borrower together with certain security (the "Receivable Security"), which may comprise:

a.  Credit support in the form of an assignment of (or the proceeds of) a documentary letter of credit (or a confirmation thereof), stand-by letter of credit, bank demand guarantee and/or credit protection insurances (in each case "Credit Support") meeting specified criteria, being that:

ii.  it is provided by an Eligible Credit Support Provider (as defined below);

iii.  it is a legal, valid and binding obligation of each of the parties thereto, enforceable against such parties in accordance with its terms, and ranks at least pari passu with the other senior unsecured, unsubordinated and unguaranteed obligations of the relevant Eligible Credit Support Provider;

iv.  if it consists of: (A) a documentary letter of credit (or a confirmation thereof), it is an irrevocable documentary letter of credit which incorporates the provisions of the UCP 600 (or any subsequent version of these rules) and is issued (in any case where it relates to a Commodity Contract) in favour of the relevant Commodity Seller; (B) a stand-by letter of credit, it is an irrevocable stand-by letter of credit which incorporates the provisions of UCP 600 (or any subsequent version of these rules) or ISP 98 (or any subsequent version of these rules) and is issued (in any case where it relates to a Commodity Contract) in favour of the relevant Commodity Buyer or Commodity Seller; or (C) a bank demand guarantee, it is an irrevocable bank demand guarantee which incorporates the provisions of URDG 758 (or any subsequent version of these rules) and is issued (in any case where it relates to a Commodity Contract) in favour of the relevant Commodity Buyer or Commodity Seller, or (in any case where it relates to a Trade Finance Loan Agreement) in favour of the Loan Receivables Originator; and

v.  it is denominated and payable in the currency in which payments are to be made under the Commodity Contract or Trade Finance Loan Agreement giving rise to the relevant Account Receivable or Loan Receivable (any such Commodity Contract or Trade Finance Loan Agreement a "Specified Agreement");

b.  Some form of security, such as pledges over Commodities or assignments of rights under Commodity Contracts.

An Account Receivable or Loan Receivable will typically meet certain specified eligibility criteria (the "Receivables Eligibility Criteria") in order for the Borrower (Issuer) to acquire it, being that:

i.  the obligor (i.e. the Commodity Buyer under the relevant Commodity Contract relating to that Account Receivable) or the Commodity Buyer or Commodity Seller (i.e. the borrower under the relevant Trade Finance Loan Agreement relating to that Loan Receivable) is in each case an "Eligible Obligor", meaning that it is an obligor satisfying certain criteria (the "Counterparty Eligibility Criteria"), being that it:

ii.  meets the Issuer's standard internal requirements on, amongst other things, KYC and other internal checks;

iii.  including, as appropriate, in relation to or based on: (A) its incorporation, domicile, financial position, countries of operation and track record in respect of the relevant Commodity; (B) the reputation and integrity of its directors, officers, shareholders and other people of influence; (C) its facilities and/or premises; (D) the quality and types of Commodities traded by it; (E) the documentation used by it in previous transactions and the identity of its previous and existing contract counterparties; (F) any available reports or references from third parties including credit reference or scoring agencies, and/or its previous or existing contract counterparties;

iv.  is not to the best of the Issuer's knowledge having made due enquiry bankrupt, insolvent or subject to any insolvency procedure or similar proceedings;

v.  is not a natural person, and has or its commodity advisory team have a minimum of 24 months of trading history;

INVESTMENT MEMORANDUM

Exhibit LJ7 / Page 172

vi.  is not to the best of the Borrower's knowledge having made due enquiry in breach of any applicable laws or regulations or in any way restricted from trading due to any Sanctions, legal action, bankruptcy, insolvency or other cause whatso-ever;

vii.  is not to the best of the Issuer's knowledge having made due enquiry in material default under any relevant Specified Agreement; and

viii.  is not involved in any judicial or arbitration proceedings with the Issuer (or any other issuer under the Programme), any party to a Specified Agreement, the Receivables Administrator or the Notes and Security Trustee;

ix.  the Eligible Obligor's obligations under the relevant Specified Agreement relating to that Loan Receivable or Account Receivable are unsubordinated and rank at least pari passu with the claims of all other unsecured creditors of that Eligible Obligor other than those whose claims are preferred by any bankruptcy, insolvency or other similar laws of general application.

x.  In the case of any Account Receivable, the receivable results from sales in the ordinary course of business and is payable within 124 days (and in any event prior to the Expected Maturity Date of the Notes in respect of which that Account Receivable is to form part of the Series Assets), and the relevant Eligible Account Receivables Originator has performed delivery of the relevant Commodity to the Commodity Buyer in accordance with the terms of that Commodity Contract;

In the case of any Loan Receivable, the Eligible Obligor is obliged to pay the relevant Loan Receivable on a fixed date falling prior to the Expected Maturity Date of the Notes in respect of which that Loan Receivable is to form part of the Series Assets; the execution and performance of the relevant Specified Agreement relating to that Loan Receivable or Account Receivable is in compliance with all applicable laws and regulations, and has not and will not breach any Sanctions;
the obligations of the Eligible Obligor's obligations under the relevant Specified Agreement relating to that Loan Receivable or Account Receivable are valid and binding (subject to normal legal reservations), and that Specified Agreement is governed by the laws of Switzerland, England, France, New York, Brazil, Singapore or Hong Kong;

xi.  as of the date of acquisition of that Loan Receivable or Account Receivable by the Borrower the relevant Receivables Originator (as defined below) is not aware that that Loan Receivable or Account Receivable has been the subject of fraud;

xii.  the relevant Receivables Originator is entitled to assign (or transfer) that Loan Receivable or Account Receivable to the Borrower (and to nominate the account specified by the Borrower for the receipt of payments in relation thereto), and the Borrower is entitled to assign the same to the Notes and Security Trustee, in each case free of contractual or other restrictions which would adversely affect such an assignment (or transfer) to the Borrower and/or the Notes and Security Trustee;

xiii.  that Loan Receivable or Account Receivable has not been sold, pledged, assigned, entrusted or otherwise conveyed to any person;

xiv.  the acquisition, ownership or disposition of that Loan Receivable or Account Receivable by the Borrower complies in all respects with its Investment Methodology.

For these purposes "Sanctions" means any applicable economic sanctions laws, regulations, embargoes, prohibitions or restrictive measures which are administered, enacted or enforced by the United States government, the United Nations, the European Union, the United Kingdom, or the respective governmental institutions and agencies of any of the foregoing, including without limitation, the Office of Foreign Assets Control of the US Department of Treasury, the United States Department of State, and Her Majesty's Treasury.

In addition, the Obligor under the Credit Support forming part of any Receivable Security must be, in the case of:

a.  Any documentary letter of credit (or a confirmation thereof), stand-by letter of credit or bank demand guarantee, a spec-ified financial institution, provided that it has a rating of A- or higher (by S&P or Fitch) or A3 or higher (by Moody's) and is to the best of the Borrower's knowledge having made due enquiry not bankrupt, insolvent or subject to any insolvency procedure or similar proceedings; and

b.  Any credit protection insurance, a specified insurance provider, provided that it has a rating of A- or higher (by S&P or Fitch) or A3 or higher (by Moody's) and is to the best of the Issuer's knowledge having made due enquiry not bankrupt, insolvent or subject to any insolvency procedure or similar proceedings
(in each case, an "Eligible Credit Support Provider").

A Trade Finance Receivable and the associated Receivable Security (together an "Eligible Receivable") have the character-istics and capacity to produce funds to enable the Borrower to meet its payment obligations as and when due under the Notes.

Loan to value ratio or level of collateralisation: between 110% and 200% depending on the nature of the Receivable.

INVESTMENT MEMORANDUM  —————————————————————————— **Exhibit LJ7 / Page 1**³**73**

Exhibit "25"
Page 13 of 40

**Account Receivable transactions:**



**Loan Receivable transactions (Trade Finance Loans to Commodity Sellers):**



**Flow of Funds**

The proceeds of each issue of a Series of Notes will be used by the Borrower to acquire Eligible Receivables from Eligible Account Receivables Originators and the Loan Receivables Originator (each as defined below), in accordance with the Borrower's investment methodology (which includes diversification of commodity buyers and sellers, commodity and geographic diversification), and to meet certain expenses and fees payable in connection with the operation of the Issuer and the issue of the Notes.

The proceeds under any Account Receivable acquired by the Borrower will consist of payments under the relevant Commodity Contract by the relevant Eligible Obligor (i.e. Commodity Buyer), and the proceeds under any Loan Receivable acquired by the Borrower will consist of repayment of the relevant Trade Finance Loan by the relevant Eligible Obligor.

INVESTMENT MEMORANDUM _____ **Exhibit LJ7 / Page 174**

Exhibit "25"
Page 14 of 40

**Where the Borrower acquires:**

a.   an Account Receivable, the Borrower will pay the relevant Eligible Account Receivables Originator for that Account Receivable (and the associated Receivable Security) at completion of the transfer to the Borrower of that Account Receivable (and the associated Receivable Security); and

b.   a Loan Receivable, the relevant Trade Finance Loan may be disbursed or undisbursed prior to when the relevant Loan Receivable is to be acquired by the Borrower. The Borrower will acquire that Loan Receivable from the Loan Receivables Originator subject to and upon the Issuer paying the loan acquisition price so that the relevant Trade Finance Loan can be disbursed to the relevant commodity borrower by or on behalf of the Loan Receivables Originator if the Trade Finance Loan has not been disbursed at that date.

The Borrower may be required to pay a fee to the Loan Receivable Originator for Loan Receivables acquired from it.

The intention of the Borrower is to retain and not to substitute any Eligible Receivables acquired by it until it receives the proceeds thereunder, unless such a substitution is required in order for the Borrower to continue to comply with its investment methodology and/or if any such Eligible Receivable no longer satisfies the Receivables Eligibility Criteria.   Once it receives the proceeds under any Eligible Receivable backing the Notes the Borrower will use such proceeds to satisfy its payment obligations under the Notes and to reinvest in other Eligible Receivables.

If any Trade Finance Receivables acquired by the Borrower are not paid on or before their due date, and remain outstanding (in whole or in part) notwithstanding that claims upon the relevant Credit Support have been made and enforcement action in respect of any other Receivable Security has been taken with respect to such Trade Finance Receivables, where such claims or enforcement action has been unsuccessful, (or the proceeds thereof are insufficient), or it is impossible to make such claims or bring such enforcement action, the Issuer will then look to sell the Eligible Receivable or Commodity to another Counterparty. To the degree the proceeds are insufficient, the Borrower may then claim upon the Credit Protection Provider under the terms of the credit insurance policy in place. Should there still be any shortfall, the Borrower may choose to draw upon its Loan Loss Reserve Accounts, or finally may sell one or more Eligible Receivables prior to the date on which it is due to receive the proceeds thereunder in order to satisfy its payment obligations under the Notes which are backed by such Eligible Receivables.

Where any Receivable Security acquired by the Borrower is enforced the Issuer may receive payments under the relevant Credit Support from the relevant Eligible Credit Support Provider and/or the proceeds of sale of any relevant Commodity, as well as payments from the Credit Protection Provider.
Where the currency of all or some of the Eligible Receivables acquired by the Issuer differs from the currency of the Series of Notes in respect of which such Eligible Receivables form part of the Series Assets, one or more foreign exchange swap agreements (each a "Swap Agreement") may be entered into by the Issuer with the Swap Counterparty.

**Description of Originators**

The originators (each, a "Receivables Originator") from which the Borrower will acquire, include:

a.   Account Receivables will be the relevant Commodity Sellers, under the relevant Commodity Contracts from which such Account Receivables arose subject to such Commodity Sellers satisfying the Counterparty Eligibility Criteria (any such Commodity Seller, an "Eligible Account Receivables Originator");

b.   Loan Receivables will be originated by, inter alia, ARIA Commodity Finance Fund, a company incorporated in Cayman Islands, whose significant business activities consist of providing trade finance loans and receivables administration services (the "Loan Receivables Originator").

The Issuer may in certain circumstances provide quarterly reports which will include certain information on the Account and Loan Receivables acquired by the Borrower and the Eligible Account Receivables and Loan Receivables Originators from which such Account Receivables have been acquired.

INVESTMENT MEMORANDUM ———————————————  **Exhibit LJ7 / Page 175**

Exhibit "25"

## Market Opportunity

Up to 80% of global trade is supported by some sort of financing or credit insurance. In fact, commodity trade  finance represents a $134bn industry annually. In short, trade finance is a multi-trillion USD global lending industry; historically though the financing has been dominated by banks.

However, banking dominion is losing its grip. Basel 3 capital reserve requirements, a host of new regulations and balance sheet constraints of many financing institutions are driving banking retrenchment from the sector. There is now a window of opportunity for investors, asset managers and corporates to fill the financing void, and benefit from the low volatility, uncorrelated income streams with limited interest rate sensitivity that such transactions bring.

**Trade Finance in numbers:**

| <5% | 0 | 1.5tn | 12trn |
|---|---|---|---|
| Of asset managers Invested in TF* | down months in TF even in 2008** | shortfall in funding required*** | size of TF market annually in USD*** |

A recent Euromoney article reflected that there was $9tn in bank financing in trade finance, and of that, currently less than 1% is provided by institutional investors. Given the numerous studies that point to its very low default rates, low volatility and lack of correlation to stock and bond markets, it makes for a prudent addition to portfolios or not to mention an option for corporate treasurers for 'yield pick up' on cash holdings, without the attendant interest rate risk that corporate bonds can bring. Institutional investors are currently responsible for nearly 29trn USD in debt and bond markets, suggesting huge potential for asset managers, high net worth individuals and corporate treasurers to take on the reins from the banking institutions.

Most goods we touch, consume, drink and own have been moved with the help of trade or commodity finance. This means short-term, asset backed lending, usually lasting only 15 -120 days, depending on the trade and the commodity.
The Issuer focusses on agricultural commodity trade finance, connecting producers and users of grains, biofuels and oilseeds, around the globe, providing access to an asset class in a convenient, tradable note format, that was hitherto difficult to gain exposure too for investors other than the banking institutions.

**Security of Trade Finance:**
Data from the International Chamber of Commerce's (ICC) Trade Register, now in its sixth year, shows the low risk nature of trade finance when judged against comparable asset classes, such as corporate and small to medium-sized enterprise (SME) lending. The findings in summary are:

i.    Trade finance continues to have a favourable risk profile when judged against comparable asset classes, such as corporate and small to medium-sized enterprise (SME) lending;
ii.   Low-risk nature of trade finance remains despite ongoing industry changes, including the slowdown in global trade, fall in commodity prices, and gradual shift of corporates towards open account;
iii.  Data provides a strong empirical basis to consider the appropriate treatment of trade finance by the Basel Accords, given its low risk profile;

The Trade Register remains the authoritative source of data and analysis on trade finance, with continuing efforts enhancing the quality and robustness of the project, including data collection and filtering, analytics, and related advocacy.

Covering US$9.1 trillion of exposures and 17 million transactions — more transactions than ever before — the data continues to verify that trade finance presents banks with little credit risk — across major products and regions.

The Trade Register highlights that short-term products are particularly low risk, citing the default rate (weighted by exposure) at 0.08% for Import Letters of Credit (L/Cs), 0.04% for Export L/Cs, 0.21% for Loans for Import/Export and 0.19% for Performance Guarantees.

Medium and long-term products also prove low risk for banks — in-part driven by the fact that in-scope transactions are covered by OECD-backed Export Credit Agencies (ECAs), at up to 95% of their value. The average default rate of medium and long-term trade finance is 0.44%, with a loss given default of 5.3%. This, in turn, drives an expected loss of 0.024%.

While the latest data reveals a slight upward trend in default rates from 2013 onwards — due to a mix of one-off events, such as the default of a large importer, and more systemic factors — the overall trend still confirms the low risk nature of trade finance.

The ICC also welcomed two new partners to the Trade Register project this year, The Boston Consulting Group (BCG) and Global Credit Data (GCD), with the aim of bringing further strategic insight, analytics capabilities and industry expertise to the report. Looking forwards, the Trade Register project aims to extend to benefit participating banks and institutions, the wider trade finance industry, and international commerce. In doing so, it will expand its product and risk coverage, while also developing advocacy campaigns beyond those aimed at the Basel Committee.

In particular, ahead of the Basel Committee's meetings to finalise the "Revised Standardised Approach" and the package of reforms to "Reduce excessive variability in risk-weighted assets (RWA)", the results of the 2016 Trade Register — drawing on data from 25 member trade and export finance banks — provide a strong empirical basis to consider an even more favourable treatment of trade finance as an asset class by the Basel Accords.

INVESTMENT MEMORANDUM ————————————————————————————— **Exhibit LJ7 / Page 176**

## Credit Support Providers, Credit Enhancements and Principal Protection

The Borrower has an innovative principal protection feature. In additional to Credit Support Providers (see listed below), the Borrower, has arranged for a further indemnity of 90% of the principal, whereby the Fund's subscribers and hence the Issuer, benefits from First Loss Payee status and hence beneficiary of the credit protection. The Credit Protection Provider is AIG (Europe) Limited, an A rated institution, which affords further insurance and comprehensive credit insurance against a whole host of named perils including confirming bank's default, (outside of the traditional insurances arranged for transit, marine, logistics, cargo etc). The Policy is designed to indemnify the Insured Party, being the Borrower's subscribers, for losses following the failure of a private Debtor (Obligor) to pay the insured debt as a result of Insolvency of the Obligor (Borrower) and Default by an Obligor (Borrower) to pay the insured debt on due date or extended due date (Protracted Default), as well trade disruption and contract frustration issues.

**Credit support providers:**
When the Fund acquires a position or engages in a trade, the receivable will consist of, or include, further credit support, (in addition to the AIG facility above), which will be provided by a credit support provider listed below. We can provide full details of each (which address, branch, legal entity etc, from the point of view of which entity is providing the issuing or confirming the L/C), but here is an overview of our more frequent credit support providers:

ABN Amro, Abu Dhabi Commercial Bank, Agricultural Bank of China, ANZ Bank, Atradius Credit Insurance N.V., Barclays Bank, BNP Paribas, DBS, JPMorgan, Korea Development Bank, MUFJ, Mitsui, National Bank of Abu Dhabi (now FAB), OCBC, RBC, Santander, Standard Chartered etc.

**Credit Enhancement:**
The Borrower will always retain twelve month's distribution or interest payments, kept in an 'Interest Maintenance Reserve'. In fact, the IMR is keep circa 1.5x the coupon coverage which translates into a circa 2.3% credit enhancement.

The first loss provision is nearly 10% from a combination of provisioning on instalments, letters of credit, first loss capital, insurance of course, subordination of management fees and over-collateralisation.

## Risk Management

In common with banks providing credit, and funds investing capital in securities, the Borrower, and/or Accounts and Loans Originator has developed its own internal risk management platform. Each transaction is assessed in a systematic basis against a range of criteria designed to validate that a prospective commodity buyer or Commodity Seller, and that the Trade Finance Loan, Receivable asset being evaluated to be leased represents an acceptable risk profile. However, the majority of the counterparties reflect long standing (10 years' plus), unblemished trading relationships.

Standard risk assessment and client onboarding requires that client due diligence be conducted. This includes determining the legal and beneficial ownership structure of each counterparty.

On a portfolio basis, the Borrower seeks to adhere to a series of guidelines designed to mitigate concentration risk across counterparties, commodities, industry sectors and geographies, and the insurance indemnities mandate that. Within the risk management framework, there is an incredibly detailed eligibility criterion for collateral management agents, as well as verification procedures for L/C procedures.

### Summary Counterparty Exposures
The following set out expected exposures from physical trading, inventory and structured finance:

| | Counterparty | Geography | Credit Rating | Credit Grade | Credit Limit (per trade) | Trade Frequency (p.a.) | Trade Tenor | LC/CAD | Summary Financials (USD) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Revenues | Net Assets |
| 1 | Mitsui&Co | Japan | A-1 (short term) | Prime | 35,000,000 | 4 | 0-30 days | CAD | $55,690,235,000 | $38,047,460,460 |
| 2 | Marubeni | Japan | BBB positive (long term) | Investment Grade | 35,000,000 | 4 | 0-30 days | CAD | $68,022,502,000 | $16,557,445,740 |
| 3 | Toyota | Japan | AA+ | Prime | 35,000,000 | 4 | 0-30 days | CAD | $318,075,836,460 | $23,757,458,380 |
| 4 | Toray | Japan | A-1 (short term) | High Investment Grade | 35,000,000 | 4 | 90-120 days | CAD | $16,291,000,000 | $10,919,000,000 |
| 5 | Sojitz | Japan | BBB- (Stable) | Investment Grade | 35,000,000 | 4 | 90-120 days | CAD | $12,726,969,228 | $5,877,178,332 |
| 6 | CJ Group | Korea | Aa3 | High Investment Grade | 35,000,000 | 6 | 90-120 days | CAD | $2,397,394,574 | $26,135,867 |
| 7 | Adama Agricultural Solutions | Hong Kong | AA- | High Investment Grade | 20,000,000 | 6 | 0-30 days | CAD | $830,000,000 | $1,807,703,000 |
| 8 | Philip Commodities Ltd | Singapore | BB | Investment Grade | 10,000,000 | 2 | 60-90 days | L/C | $120,000,000 | $28,000,000 |
| 9 | LM Agromond | Hong Kong | BB | Investment Grade | 10,000,000 | 2 | 60-90 days | L/C | $172,895,649 | $133,795,114 |
| 10 | OBH | Australia | AA | High Investment Grade | 25,000,000 | 8 | 60-90 days | CAD | $28,000,000,000 | $16,000,000,000 |
| 11 | Barry Callebaut | Switzerland | Baa3 | Investment Grade | 25,000,000 | 3 | 0-30 days | L/C | $1,476,951,000 | $48,563,000 |
| 12 | BASF | Germany | A-1 | High Investment Grade | 20,000,000 | 3 | 60-90 days | CAD | $18,102,960,000 | $57,882,840 |
| 13 | Syngenta | Switzerland | A-3 | High Investment Grade | 20,000,000 | 3 | 60-90 days | CAD | $13,523,000,000 | $4,202,000,000 |
| 14 | REWE Group | Germany | A- | High Investment Grade | 20,000,000 | 3 | 0-30 days | CAD | $55,002,831,680 | $10,570,387,764 |
| 15 | GS Agri | Germany | A4+ | Investment Grade | 10,000,000 | 4 | 120-180 days | L/C | $381,030,000 | $72,239,000 |
| 16 | Terra Santa Agro | Brazil | BB | Investment Grade | 10,000,000 | 2 | 120-180 days | CAD | $158,080,899 | $266,387,367 |
| 17 | Fazendao Agronegocio | Brazil | BB | Investment Grade | 10,000,000 | 2 | 120-180 days | CAD | $128,109,936 | $42,125,067 |
| 18 | CooperPluma | Brazil | BB | Investment Grade | 5,000,000 | 2 | 120-180 days | CAD | $8,641,269 | $5,154,157 |
| 19 | Pakistan State Oil Refinery | Pakistan | (S/T) A1+ | Medium Investment Grade | 15,000,000 | 8 | 0-30 days | L/C + PB* | $9,331,517,305 | $2,088,371,733 |
| 20 | Total | Pakistan | (S/T) A1+ | Medium Investment Grade | 25,000,000 | 6 | 0-30 days | L/C + PB | $171,493,000,000 | $185,926,000,000 |
| 21 | Attock | Pakistan | (S/T) A1+ | Medium Investment Grade | 15,000,000 | 12 | 0-30 days | L/C + PB | $186,926,000,000 | $198,131,544 |
| 22 | Shel | UAE | (S/T) A1+ | Prime | 25,000,000 | 12 | 30-60 days | L/C + PB | $305,179,000,000 | $197,912,000,000 |
| 23 | Vivero | United States | Baa2 | Investment Grade | 25,000,000 | 12 | 30-60 days | CAD | $90,651,000,000 | $27,259,000,000 |
| 24 | Green Plains | United States | B2 (L/T foreign currency) | Investment Grade | 25,000,000 | 8 | 30-60 days | CAD | $3,859,752,000 | $1,062,989,000 |
| 25 | CHS Inc | United States | BB+ | Investment Grade | 25,000,000 | 6 | 30-60 days | CAD | $32,683,347,000 | $8,165,028,000 |
| 26 | Koch Industries | United States | AA+ | Prime | 35,000,000 | 3 | 30-60 days | CAD | $110,000,000,000 | $96,600,000,000 |

\* Performance Bond also taken out for 10% of annual notional trade value
\*\* Parent Group combined

**RISK MANAGEMENT PROCESS:**



| | |
|---|---|
| **STAGE 1** – DEAL ORIGINATION & INITIAL ASSESSMENT | Portfolio tested for concentrations to ensure adequate diversification across commodities, countries & counterparties |
| **STAGE 2** – RISK GRADING & BACKGROUND CHECKS | Information provided by prospective counter-parties is investigated, and combined with our in-house quantitative & qualitative risk assessment models – to produce a risk score of between 1 and 8 |
| **STAGE 3** – ON SITE DUE DILIGENCE | If a deal passes initial screening process, senior staff personally investigate and visit companies, warehouses & entire supply chain involved in any deal |
| **STAGE 4** – FINAL RISK ASSESSMENT & MITIGATION, DEAL STRUCTURING & DOCUMENTATION | The due diligence visit provides additional information causing the team to decide upon which risk mitigation tools to use and to determine pricing |
| **STAGE 5** – CLOSING & DEAL MONITORING | Daily collateral and covenant monitoring |

**REPAYMENT**

## INVESTMENT METHODOLOGY

### Eligibility and allocation
The Receivables Administrator will review, or will delegate to any party designated by it the review, of each potential Trade Finance Receivable and associated Receivable Security to verify whether the Receivables Eligibility Criteria are met, including whether the relevant Commodity Buyer or Commodity Seller is an Eligible Obligor.

### Diversification
The Borrower will use its best efforts to ensure that until the date that is 30 days prior to the Expected Maturity Date of the relevant Notes the Eligible Receivables acquired and owned by it from time to time will have no less than 12 different Trade Finance Receivables in total (subject always to being able to acquire Trade Finance Receivables from time to time that meet the Receivables Eligibility Criteria (including paragraphs (iv) and (v) of that definition)).

### Portfolio limits
The Borrower is committed to maintaining a diverse mix of Commodity types within each portfolio of Eligible Receivables acquired. At no point will the aggregate acquisition cost of one or more Eligible Receivables relating to the same Commodity represent more than 30 per cent of the aggregate acquisition cost of all the Eligible Receivables from time to time owned by the Issuer. For these purposes each specific type or sub-type of Commodity, for example, soy beans or soy bean meal products, is considered a separate Commodity.

### Geographic diversification
Similarly, the Borrower is committed to acquiring Eligible Receivables that originate from or relate to a wide variety of countries, both established and emerging. If any specific country or countries are to be excluded, such country or countries will be stated in the relevant Final Terms.

### Currency hedging
Where the currency of all or some of the Eligible Receivables to be acquired by the Issuer differs from the currency of the Series of Notes in respect of which such Eligible Receivables are to form part of the Series Assets, the Issuer may enter into one or more foreign exchange swap agreements (each a "Swap Agreement") with the Swap Counterparty. Each such Swap Agreement will provide for: (a) the acquisition by the relevant Issuer of the required amount of the currency from the Swap Counterparty to purchase the relevant Eligible Asset(s) by the sale of the equivalent amount of the currency of the relevant Series of Notes to the Swap Counterparty; (b) the simultaneous agreement by the relevant Issuer to sell to the Swap Counterparty the amount of the currency of the relevant Eligible Asset(s) acquired that is expected to be realised upon maturity of such Eligible Asset(s) and to acquire from the Swap Counterparty the equivalent amount of the currency of the relevant Series of Notes. Both the spot rate and the forward rate for such currency acquisitions and sales will be agreed in advance.

### Account and Loan Origination Step Process:
Origination emanates from proven business franchise with long-standing clients

### Transaction Selection:
Long-term familiarity with markets and cycles
Intensive due diligence processes with a "roll-up the sleeves" attitude

INVESTMENT MEMORANDUM ——————————————————————————— **Exhibit LJ7 / Page 179**

Each investment proposal includes:
i.   Business and Credit Risk Analysis
ii.  Cash-flow, Collateral, Liquidation and Management Analysis
iii. Security and Covenant Monitoring Package
iv.  Proprietary Scorecard Rating
v.   All prospective transactions are rated through a proprietary credit scoring process, allowing for a consistent risk/reward evaluation

**Risk Assessment and Mitigation Process:**



## Ongoing Role of the Account and Loan Receivables Originator and Servicer

The prime roles of the Receivables Administrator and Originator, the ARIA Commodity Finance Fund, is to:
i.    Originate high quality trade finance opportunities
ii.   Arrange, structure and deploy the funding of the transaction
iii.  Manage the transaction through the lifecycle
iv.   Upon completion or termination, recover the Asset and sell, re-deploy or re-invest.
v.    Take all action necessary to protect the Asset and maintain its value
vi.   Provide good governance and reporting to the counter-parties
vii.  Ensure the covenants of the Notes are achieved

An Investment Management Agreement and/or servicer agreement exists to document these roles and responsibilities in-depth.

## Representative Transactions;

Presented below are a selection of representative commodity transactions conducted by the Borrower and Originators in the last three years:

**Wheat:**
Commodity: Australian Wheat
Anticipated Trade Size: 10mn USD
Maximum Duration per Transaction: 90 days
Average Duration per Transaction: 45 days
Quantity: up to 7,500 M/T
Geographic Origin: Australia
Geographic Destination: Singapore, South Korea
Seller: CBH, Australia
Buyers: Investment Grade Counterparties
Payment Structure: L/C

INVESTMENT MEMORANDUM ——————————————— **Exhibit LJ7 / Page 180** 21

Credit Support: see details of Providers above
Credit Enhancement: ARIA Commodity Finance Fund Comprehensive Credit Default Policy
Inspection: Independent FOSFA or GATFA accredited surveyors or laboratories

**Soybeans:**
Commodity: Brazilian Soy Beans
Anticipated Trade Size: 15mn USD
Maximum Duration per Transaction: 60 days
Average Duration per Transaction: 42 days
Quantity: up to 32,000 M/T
Geographic Origin: Mato Grasso, Brazil
Geographic Destination: Japanese Conglomerate Trading House
Seller: Cooper Pluma, large co-operative Brazil
Buyers: Investment Grade Counterparties
Payment Structure: L/C
Credit Support Provider: see details of Providers above
Credit Enhancement: ARIA Commodity Finance Fund Comprehensive Credit Default Policy
Inspection: Independent FOSFA or GATFA accredited surveyors or laboratories

INVESTMENT MEMORANDUM ———————————————————— Exhibit LJ7 / Page 181

## Commodity Trading Team

**INVESTMENT MANAGER/RECEIVABLES ADMINISTRATOR:**

ARIA Capital Manager is an asset management business which a focus on alternative beta, institutional funds. With offices in 6 countries and regulated by the FCA in the UK, the MFSA in Europe, ESCA in the UAE, CIMA in the Cayman Islands and HKCIB in Hong Kong, it has nearly 2bn USD in AuA.

**INVESTMENT ADVISER:**

Arcadia Trading is a global, independent commodity trading firm covering a broad spectrum of commodities, including oil products, gas and power and agricultural commodities.  Originally established in 1988 as a crude oil trading company, it has since expanded its scope and coverage to become a global multi-commodity platform - active in trading, investment initiatives and client based risk management solutions. Originally owned by Mitsubishi, it was sold to Farahead group with a market cap in excess of US $10bn (owned by shipping magnate John Frederiksen).

**James Nuttall**

James vision is to offer its customers (producers and consumers) with a boutique approach to service, be it risk management, structured finance or physical trading across agricultural commodities. James has spent his entire career within the agricultural commodity sector, both from the banking and finance side (having worked at banks such as BNP Paribas, UBS and Citi) as well as the client side (Armajaro). James has a BA in French from the University of Southampton.

**Alex von Erlea**

Alex von Erlea is in charge of the physical trading desk. His entire career in the agribusiness was dedicated to originate grains, beans, meals, veg oils and cotton in countries such as Brazil, Argentina, Paraguai, USA and Australia and supply these products to some of the strictest markets in the world (Japan, South Korea, China, Middle East, Europe etc) through long term partnerships. Alex is specialized in structured origination (trade finance, risk management, logistics and barter – partnership with defensives and fertilizers suppliers) working for 11 years for Japanese shareholders (Mitsui and Sojitz). Alex holds a BA in economics from Insper University in São Paulo/Brazil.

**Lane Walker**

Having completed a B.S. in Ag with Honours in Lincoln, Nebraska, Lane headed up the Trading operation of Drexel Burnham Lambert as Vice President, managing proprietary trading operations and grain inventory and trading finance. From there he spent nearly 10 years at Farmland Industries as a Director of Galveston and Commodity Manager. From there, Lane has worked for ADM as VP and Director of Trading, managing a team of approximately 45 with oversight of origination, storage inventory management risk management hedging trading and marketing and sales. Having founded Walker Trading, he has built a global customer base with core activity in North America, Mexico, MENA West Africa and South America brokering durum wheat, white maize and Australian Wheat.

**Simon Arnold**

Simon graduated from City of London Polytechnic study in the Study of Grains, Feeding Stuffs, Oils and Oilseeds. Simon joined Soufflet in the UK in 1978 before ultimately becoming a senior trader responsible for French wheat imports into UK and exports of barley to Saudi Arabia. From there, he worked for Tradigrain in Geneva until 1992, as Senior Trader responsible for World Barley Trade along with head of business development/marketing. In 2013, he accepted the Managing Director role at Quadra SA. before building up their grain business resulting in growth in trading tonnage from1.3 mmt to 4.5 mmt over the 3 years. Simon founded Seagrain S.A. in Switzerland and has full responsibility for trading, chartering, forex management along with executive responsibilities for running the business, reporting to audit level, relationship with banks, customers. Seagrain S.A. is a 50 pct shareholder in Baltic Cape Silos, a 20k mt export silo situated in Liepaja, Ukraine.

**Anil Dharan**

Anil brings more than 20 years of experience in derivatives trading. Previously, he was at ECOM where he was a portfolio manager for a commodities fund and founder and CEO of a derivative trading business. Prior to this, he was at JP Morgan where he managed portfolios of Exotic options, and OTC derivatives structures as well as proprietary trading positions in Agricultural Commodities after leaving Man Group where he was a portfolio manager of cross assets exotic derivatives. From 1997 through to 2005, Anil worked at ING Barings firstly as Emerging Market Quantitative Trader and then as Exotic Currency Options Trader. Anil graduated with Bachelor of Science Degree in Mathematics and Statistics from the University of Sussex and holds a Postgraduate Diploma in Applied Statistics from the University of Oxford.

**Andrew Vellani**

Andrew is an international lawyer who has built and led legal teams in substantial public and private enterprises on four continents over three decades. He has held numerous business leadership positions at board level with some of the worlds' most prestigious companies and families. He started with the Bunge group, prior to spending 17 years with Scottish & Newcastle plc where he was Group Legal Director. Subsequently, Andrew was Chief Legal Officer of COFRA holding AG a company representing the business interests of one of Europe's leading business families. More recently, Andrew was Chief Legal Officer Group and Corporate Affairs with the Abdul Latif Jameel group in Saudi Arabia. His Experience has included major international M&A transactions; International Joint Ventures; the establishment of Private Equity Funds; the creation of asset management structures; and Corporate Governance (with a focus on multi-generational family business).

**Shakeb Elahi**

Shakeb is graduate in Geology, entrepreneur, started his brokerage and trading business in 1981 with his proprietorship Delta International in Pakistan. Specialising in sales of raw and packaging material for the pharmaceutical industry, including chemicals, glass bottles etc. In 1995 diversified to agricultural commodities with 1st ever sale any oilseeds; soybeans imported into Pakistan. Went on to sell sun seeds and canola hence opening a market of oilseeds which is has reached to 3 MMT in 2016-17. Shakeb also set up and managed and feed grain and edible oil trading terminal at Bander Imam Khomeini 2006-09 before ultimately becoming Managing Director of Al Ghurair Soft Commodities in the UAE. is currently working as a regional consultant to the US Grains Council to advise and assist in developing the sale of their portfolio of products including, feed grains DDGS and ethanol.

**Matt Brittain**

Matt is Chief Executive Officer of ARIA's Dubai office. Having been one of the founder shareholders of ARIA and its forebears in 2005, ARIA has grown to become a multi-dimensional asset management with group with over 2bn of assets, managed across mandates that include both financial markets and alternative assets including shipping, agriculture and infrastructure. Before founding ARIA, having left Manchester University, Matt joined King and Shaxon in the City of London for 2 years, before then heading up the Moorgate office of Redmayne Bentley Stockbrokers. He has an BSc Hons from Allianz Business School in the UK, is a Chartered Member of the Chartered Institute of Securities and Investments and holds the IMC, MSCI and various corporate finance designations

INVESTMENT MEMORANDUM ——————————————————————— **Exhibit LJ7 / Page 183**

Exhibit "25"
Page 23 of 40

## Relevant Definitions

The following terms have the following meanings:

A.  **"Commodity"** means any physical (typically agricultural), asset capable of being sold and purchased pursuant to a Commodity Contract including without limitation energy assets (excluding crude oil), hard assets (metals, minerals, mining products, etc.) and soft assets (agricultural products, etc.), and any other physical asset, in each case whether in the form of raw materials, or semi-finished or finished goods;

B.  **"Commodity Buyer"** means the buyer of a Commodity;

C.  **"Commodity Contract"** means a legally binding contract for the sale and purchase of a particular Commodity;

D.  **"Commodity Seller"** means the seller of a Commodity;

E.  **"Counterparty Eligibility Criteria"** means, in respect of any Commodity Buyer or CommoditySeller, that it:

    i.    meets the relevant Borrower's standard internal requirements on, amongst other things, KYC and other internal checks including, as appropriate, in relation to or based on:

        A.    its incorporation, domicile, financial position, countries of operation and track record in respect of the relevant Commodity;

        B.    the reputation and integrity of its directors, officers, shareholders and other people of influence;

        C.    its facilities and/or premises;

        D.    the quality and types of Commodities traded by it;

        E.    the documentation used by it in previous transactions and the identity of its previous and existing contract counterparties;

        F.    any available reports or references from third parties including credit reference or scoring agencies, and/or its previous or existing contract counterparties;

    i.    is not to the best of the relevant Borrower's knowledge having made due enquiry bankrupt, insolvent or subject to any insolvency procedure or similar proceedings;

    ii.    is not a natural person, and has or its management has a minimum of 24 months of trading history;

    iii.    is not to the best of the relevant Borrower's knowledge having made due enquiry in breach of any applicable laws or regulations or in any way restricted from trading due to any Sanctions, legal action, bankruptcy, insolvency or other cause whatsoever;

    iv.    is not to the best of the relevant Borrower's knowledge having made due enquiry in material default under any relevant Specified Agreement; and

    v.    is not involved in any judicial or arbitration proceedings with any Borrower, any party to a Specified Agreement, the Receivables Administrator or the Notes and Security Trustee;

F.  **"Credit Support"** means, in respect of:

    i.    any Commodity Buyer (or, if applicable, any Primary Commodity Buyer or Secondary Commodity Buyer) in its capacity as a party to a Commodity Contract:

        A.    a documentary letter of credit (or a confirmation thereof), a stand-by letter of credit or a bank demand guarantee in respect of its payment obligations under that Commodity Contract (or, if applicable, relevant Primary Commodity Contract or Secondary Commodity Contract); or

        B.    if such a documentary letter of credit (or a confirmation thereof), stand-by letter of credit or bank demand guarantee is not available, a credit insurance policy covering at least 90 per cent of the value of its payment obligations under that Commodity Contract (or, if applicable, relevant Primary Commodity Contract or Secondary Commodity Contract),

INVESTMENT MEMORANDUM ————————————————————— **Exhibit LJ7 / Page 184**

which in each case meets the Credit Support Criteria;

i.  any Commodity Seller in its capacity as a party to a Commodity Contract, a stand-by letter of credit or bank demand guarantee in respect of its performance obligations under that Commodity Contract (or, if under that Commodity Contract the relevant Commodity Buyer has prepaid the relevant Commodity, in respect of the return of the monies prepaid by such Commodity Buyer), which meets the Credit Support Criteria; or

ii.  any Commodity Buyer or Commodity Seller, in each case in its capacity as a borrower under a Trade Finance Loan Agreement:

   A.  a stand-by letter of credit or a bank demand guarantee in respect of its payment obligations under that Trade Finance Loan Agreement; or

   B.  if such a stand-by letter of credit or bank demand guarantee is not available, a credit insurance policy covering at least 90 per cent of the value of its payment obligations under that Trade Finance Loan Agreement, which in each case meets the Credit Support Criteria;

G.  **"Credit Support Criteria"** means, in respect of any Credit Support, that: (i) it is provided by an Eligible Credit Support Provider;

i.  it is a legal, valid and binding obligation of each of the parties thereto, enforceable against such parties in accordance with its terms, and ranks at least pari passu with the other senior unsecured, unsubordinated and unguaranteed obligations of the relevant Eligible Credit Support Provider;

ii.  if it consists of:

   A.  a documentary letter of credit (or a confirmation thereof), it is an irrevocable documentary letter of credit which incorporates the provisions of the UCP 600 (or any subsequent version of these rules), and is issued (in any case where it relates to a Commodity Contract) in favour of the relevant Commodity Seller or the Borrower;

   B.  a stand-by letter of credit, it is an irrevocable stand-by letter of credit which incorporates the provisions of UCP 600 (or any subsequent version of these rules) or ISP 98 (or any subsequent version of these rules), and is issued (in any case where it relates to a Commodity Contract) in favour of the relevant Commodity Buyer or Commodity Seller or the Borrower; or

   C.  a bank demand guarantee, it is an irrevocable bank demand guarantee which incorporates the provisions of URDG 758 (or any subsequent version of these rules), and is issued (in any case where it relates to a Commodity Contract) in favour of the relevant Commodity Buyer or Commodity Seller or the Borrower, (in any case where it relates to a Trade Finance Loan Agreement) in favour of the Loan Receivables Originator; and

   i.  it is denominated and payable in the currency in which payments are to be made under the Specified Agreement to which it relates;

H.  **"Credit Support Provider"** means a financial institution or insurance provider included in the section of this Base Prospectus headed "Description of the Credit Support Providers";

I.  **"Eligible Account Receivables Originator"** means, in respect of a Commodity Seller from which the Borrower is proposing to acquire any Account Receivable, that such Commodity Seller satisfies the Counterparty Eligibility Criteria;

I.  **"Eligible Credit Support Provider"** means, in respect of any:

   x.  documentary letter of credit (or a confirmation thereof), stand-by letter of credit or bank demand guarantee, a Credit Support Provider if and for so long as it has a rating of A- or higher (by S&P or Fitch) or A3 or higher (by Moody's) and is to the best of the relevant Issuer's knowledge having made due enquiry not bankrupt, insolvent or subject to any insolvency procedure or similar proceedings; and

   xi.  credit protection insurance, a Credit Support Provider if and for so long as it has a rating of A- or higher (by S&P or Fitch) or A3 or higher (by Moody's) and is to the best of the relevant Issuer's knowledge having made due enquiry not bankrupt, insolvent or subject to any insolvency procedure or similar proceedings;

K.  **"Eligible Obligor"** means, in respect of a Commodity Buyer or Commodity Seller that is the borrower under a relevant Trade Finance Loan Agreement or the Commodity Buyer under the relevant Commodity Contract, it is a Commodity Buyer or Commodity Seller satisfying the Counterparty Eligibility Criteria;

L.  **"Loan Receivables Originator"** means ARIA Commodity Finance Fund or other entity as may be engaged from time to time;

INVESTMENT MEMORANDUM ———————————————————————— **Exhibit LJ7 / Page 185**

M. **"Perfected (Completely)"** means that:

   i.   the relevant Receivable Security is Perfected (Partly);

   ii.   if the relevant Receivable Security comprises an assignment of any rights (including proceeds) under any agreement (including any Commodity Contract or Credit Support), notice of such assignment has been provided to the relevant counterparty (including the relevant Eligible Obligor or the relevant Eligible Credit Support Provider);

   iii.   if the relevant Receivable Security comprises a pledge or similar security over a Commodity, the relevant person receiving such pledge or similar security has taken actual or constructive possession of the Commodity that is subject thereto; and

   iv.   any other applicable perfection requirement in any relevant jurisdiction with respect to the relevant Receivable Security has been satisfied;

N. **"Perfected (Partly)"** means that, where the relevant Receivable Security comprises a form of security requiring registration under any applicable law, such registration has been duly completed within the time allowable for such registration;

O. **"Receivable Security"** means, in respect of:

   i.   any Account Receivable, the relevant security described above in respect of that Account Receivable under the heading "Account Receivable Security"; and

   ii.   any Loan Receivable, the relevant security described above in respect of that Loan Receivable under the heading "Trade Finance Loan types and Loan Receivable Security" (or, where the Loan Receivable arises from a Trade Finance Loan provided other than in the exact circumstances described under that heading, security which as far as practicable most closely approximates the relevant Receivable Security that would have applied in respect of a Trade Finance Loan which most closely approximates such other Trade Finance Loan), in all cases for so long as, and to the extent that, such security would be enforceable upon a default in the payment of the relevant Trade Finance Receivable;

P. **"Receivables Administrator"** means ARIA Capital Management Ltd, or such other person fulfilling the role of Receivables Administrator from time to time;

Q. **"Receivables Eligibility Criteria"** means, in respect of any Loan Receivable or Account Receivable, that:

   i.   the Commodity Buyer or Commodity Seller that is the borrower under the relevant Trade Finance Loan Agreement relating to that Loan Receivable, or the Commodity Buyer under the relevant Commodity Contract relating to that Account Receivable, is in each case an Eligible Obligor;

   ii.   the Eligible Obligor's obligations under the relevant Specified Agreement relating to that Loan Receivable or Account Receivable are unsubordinated and rank at least pari passu with the claims of all other unsecured creditors of that Eligible Obligor other than those whose claims are preferred by any bankruptcy, insolvency or other similar laws of general application;

   iii.   in the case of any Account Receivable, the receivable results from sales in the ordinary course of business and is payable within 124 days (and in any event prior to the Expected Maturity Date of the Notes in respect of which that Account Receivable is to form part of the relevant Series Assets), and the relevant Eligible Account Receivables Originator has performed delivery of the relevant Commodity to the Commodity Buyer in accordance with the terms of that Commodity Contract;

   iv.   in the case of any Loan Receivable, the Eligible Obligor is obliged to pay the relevant Loan Receivable on a fixed date falling prior to the Expected Maturity Date of the Notes in respect of which that Loan Receivable is to form part of the relevant Series Assets;

   v.   the execution and performance of the relevant Specified Agreement relating to that Loan Receivable or Account Receivable is in compliance with all applicable laws and regulations, and has not and will not breach any Sanctions;

   vi.   the obligations of the Eligible Obligor's obligations under the relevant Specified Agreement relating to that Loan Receivable or Account Receivable are valid and binding (subject to normal legal reservations), and that Specified Agreement is governed by the laws of Switzerland, England, Brazil, France, New York, Singapore or Hong Kong;

   vii.   that Loan Receivable or Account Receivable is payable in U.S. dollars, Euro, Brazilian Real, Sterling, Swiss Francs, Australian Dollars, Hong Kong Dollars or Japanese Yen;

   viii.   as of the date of acquisition of that Loan Receivable or Account Receivable by the Borrower, the relevant Receivables Originator is not aware that that Loan Receivable or Account Receivable has been the subject of fraud;

   ix.   the relevant Receivables Originator is entitled to assign (or transfer) that Loan Receivable or Account Re-

INVESTMENT MEMORANDUM —————————————————————————

ceivable to the relevant Issuer (and to nominate the account specified by the relevant Issuer for the receipt of payments in relation thereto), and the relevant Issuer is entitled to assign the same to the Notes and Security Trustee, in each case free of contractual or other restrictions which would adversely affect such an assignment (or transfer) to the Borrower and/or the Notes and Security Trustee;

x.   that Loan Receivable or Account Receivable has not been sold, pledged, assigned, entrusted or otherwise conveyed to any person;

xi.   the relevant Borrower is able to assign and/or transfer the Receivable Security associated with that Loan Receivable or Account Receivable to the Notes and Security Trustee free of contractual or other restrictions which would adversely affect such an assignment and/or transfer; and

xii.   the acquisition, ownership or disposition of that Loan Receivable or Account Receivable by the Borrower complies in all respects with its Investment Methodology (as described above);

R.   **"Receivables Originator"** means the Loan Receivables Originator or the relevant Eligible Account Receivables Originator (as the case may be);

S.   **"Sanctions"** means any applicable economic sanctions laws, regulations, embargoes, prohibitions or restrictive measures which are administered, enacted or enforced by the United States government, the United Nations, the European Union, the United Kingdom, or the respective governmental institutions and agencies of any of the foregoing, including without limitation, the Office of Foreign Assets Control of the US Department of Treasury, the United States Department of State, and Her Majesty's Treasury;

T.   **"Series Assets"** means assets (including any acquired Eligible Assets, Trade Finance Assets, Loan Receivable or Account Receivables and any contractual rights), together the "Series Assets", of the Borrower;

U.   **"Secondary Commodity Contract"** means a Commodity Contract entered into by the Commodity Buyer (the "Primary Commodity Buyer") under another Commodity Contract (the "Primary Commodity Contract"), in relation to the sale of the Commodity acquired or to be acquired by the Primary Commodity Buyer under the Primary Commodity Contract to another Commodity Buyer (the "Secondary Commodity Buyer");

V.   **"Specified Agreement"** means a Commodity Contract or Trade Finance Loan Agreement (as the case may be) giving rise to an Account Receivable or Loan Receivable respectively which in each case is to form, or forms, part of an Eligible Asset acquired, or to be acquired, by the relevant Issuer;

W.   **"Swap Counterparty"** means Barclays Bank, Marex Financial or any other Swap Counterparty appointed from time to time;

X.   **"Trade Finance Loan"** means a loan provided pursuant to a Trade Finance Loan Agreement;

Y.   **"Trade Finance Loan Agreement"** means a loan agreement entered into between the Loan Receivables Originator (as lender) and a Commodity Buyer or Commodity Seller (as borrower); and

Z.   **"Trade Finance Receivable"** means any Account Receivable or Loan Receivable, in each case for so long as, and to the extent that, it has not been paid.

# Risk Factors

Prospective investors should read the whole of Listing Particulars and this Investment Memorandum. Words and expressions defined in the "Terms and Conditions of the Notes" below or elsewhere in this Investment Memorandum have the same meanings in this section.

The Issuer believes that the following factors may affect its ability to fulfil its obligations under the Notes. All of these factors are contingencies which may or may not occur and the Issuer is not in a position to express a view on the likelihood of any such contingency occurring.

The Issuer believes that the factors described below represent the principal risks inherent in investing in Notes issued under the Programme, but the inability of the Issuer to pay interest, principal or other amounts on or in connection with any Notes may occur for other reasons and the Issuer does not represent that the statements below regarding the risks of holding any Notes are exhaustive. Prospective investors should also read the detailed information set out elsewhere in this Listing Particulars and reach their own views prior to making any investment decision.

## RISKS RELATING TO THE ISSUER General
The Issuer is a recently incorporated company and, as such, has no historical trading or financial information. In relation to the Series 2019-CFF1 Notes, the Issuer has, and will have, no assets other than its issued and paid-up share capital, any proceeds received in connection with the issuance of the Series 2019-CFF1 Notes, the Secured Loan and the Security.

The performance of the Series 2019-CFF1 Notes is linked directly and wholly to the performance in future of the Borrower (and of the Account or Loan Receivables), which may be affected by a large number of factors, many of which are beyond its control. The Issuer is dependent upon the Borrower locating and transacting appropriately in a timely manner to ensure that the returns due under the Series 2019-CFF1 Notes can be paid. There can be no guarantee that the Borrower will be able to transact (i) within a timescale and at a cost level that enables the Issuer to meet its obligations to the Noteholders in full, or (ii) so as to enable the Borrower to meet their obligations under the Secured Loan Agreements in full.

## Limited resources of the Issuer
The ability of the Issuer to meet its obligations to pay amounts due under the Series 2019-CFF1 Notes and its operating and administrative expenses is solely dependent upon the extent of monies received or recovered by or on behalf of the Issuer. In relation to the Series 2019-CFF1 Notes, such monies consist solely of monies received by way of (a) contractual payments on the Secured Loan, and/or (b) any income earned on the Collateral Account, and/or (c) realisations on enforcement or disposal of the assets subject to the Issuer Security.

The Issuer is a special purpose vehicle incorporated solely for the purpose of issuing Notes and lending the proceeds of such note issuances to Borrower and as such will not have any other funds available to it to meet its obligations under the Series 2019-CFF1 Notes or any other payments. There is no assurance that there will be sufficient funds to enable the Issuer to make payments (whether of principal or interest) on any Series 2019-CFF1 Notes. The Series 2019-CFF1 Notes are not guaranteed by any other person, nor is any other recourse available to the Noteholders against any person other than the Issuer for sums owed to them.

## The Issuer's working capital reserves may not be adequate to meet its obligations
The Issuer intends to maintain working capital reserves to meet its prospective obligations, including operating expenses and administrative expenses. If the Issuer does not have adequate cash reserves to continue its operations Investors could suffer substantial losses unless the Issuer is able to secure additional funds. Under such circumstances, the Issuer may need to borrow funds. There is no assurance that such borrowing will be available at all or on terms acceptable to the Issuer or which present
no issues for future payments to Investors.

## The value of the Account or Loan Receivables may not be sufficient, and the Issuer may be unable to realise the full value of the collateral securing its loan portfolio
The value of the collateral securing the Account or Loan Receivables may significantly fluctuate or decline due to factors beyond the Issuer's control, including factors specific to the Borrower, or macroeconomic factors affecting the Latin America, South East Asia, MENA, UK, EEA or world economies generally, or force majeure events (such as natural disasters like floods or landslides). Even where the underlying value of the relevant assets is unaffected, realisation of such assets if required to be made will give rise to cost, timing and potential recoverability risks which may lead to a shortfall in realisation proceeds as against the underlying asset value, giving rise to a loss to Noteholders.

The Issuer may additionally not have sufficiently recent information on the value of the relevant assets which may result in an inaccurate assessment for impairment of losses secured by that collateral. If this were to occur, the Issuer may need to make additional provisions to cover actual impairment losses of its loans, which may materially and adversely affect its results of operations and financial condition.

## Risks relating to the limited recourse obligations of the Issuer
The Series 2019-CFF1 Notes are limited recourse obligations of the Issuer, and recourse under each Series of Notes is limited to the Issuer Security.

INVESTMENT MEMORANDUM ──────────────────────── **Exhibit LJ7 / Page 188**

The ability of the Issuer to meet its obligations to pay amounts due under the Series 2019-CFF1 Notes and its operating and administrative expenses is solely dependent upon the extent of monies received or recovered by or on behalf of the Issuer. In relation to the Series 2019-CFF1 Notes, such monies consist solely of monies received by way of (a) contractual payments on the Secured Loan, and/or (b) any income earned on the Collateral Account, and/or (c) realisations on enforcement or disposal of the assets subject to the Issuer Security (together, "Realised Funds").

If the Realised Funds are insufficient to make payment in full of all amounts then due in respect of the Series 2019-CFF1 Notes, the other assets of the Issuer (including, without limitation, assets securing any other series of notes) will not be available for payment of any shortfall arising therefrom, leading to losses to the Noteholders.

Enforcement or disposal of the assets which are subject to the Issuer Security for the Series 2019-CFF1 Notes is the only substantive remedy available for the purposes of recovering amounts owed in respect of the Series 2019-CFF1 Notes. If those assets are insufficient to enable the Issuer to meet its liabilities to the Noteholders, there will be a loss to the Note-holders.

### Risks related to the enforcement of Issuer Security

The Issuer Security will become enforceable in accordance with the Conditions and will be enforced by the Security Trustee if an Event of Default has occurred. A substantial amount of time may elapse between the occurrence of an Event of Default and the payment of the proceeds of enforcement to the Noteholders. Hence there is a risk that proceeds of enforcement will be paid out on a date which falls after the scheduled maturity date set out in the Conditions, and/or will be lower than the estimated redemption amount of the Series 2019-CFF1 Notes, resulting in losses to the Noteholders.

The Security Trustee will not be required to take any action that would involve any personal liability or expense without first being indemnified and/or prefunded and/or secured to its satisfaction. If the Security Trustee is not satisfied with its indemnity and/or pre-funding and/or security it may decide not to take such action, without being in breach of its obligations. Noteholders should be prepared to bear the costs associated with any such indemnity and/or pre-funding and/or security and/or the consequences of such inaction by the Security Trustee. Such inaction by the Security Trustee will not entitle the Noteholders to proceed themselves directly against the Issuer.

In respect of the Issuer Security, the rights of Noteholders to be paid amounts due under the Series 2019-CFF1 Notes will be subordinated to (i) the fees, costs, expenses and liabilities due and payable to the Security Trustee and Note Trustee including costs incurred in the enforcement of the Issuer Security and the Security Trustee and Note Trustee's remuneration, (ii) amounts owing to the agents under the Transaction Documents, and (iii) any other claims as specified in the Conditions, the Trust Deed and Trust Deed Supplement relating to the relevant Series 2019-CFF1 Notes that rank in priority to the claims of Noteholders, which will include any other claims as specified in the Secured Loan documentation relating to the relevant Secured Loan that ranks in priority to the claims of the Issuer (which latter claims may be significant where the Issuer is not a first-ranking charge-holder and which, if such claims are significant and rank in priority to any claims of the Issuer, may seriously deplete or wipe-out any recoveries due to the Issuer, or delay planned recoveries to an extent where it becomes uneconomic to proceed with such planned recoveries).

### Performance risk of Third Parties

The ability of the Issuer to make payments in respect of the Series 2019-CFF1 Notes will depend to a significant extent upon the due performance by the Transaction Parties of their respective services, duties, obligations and undertakings under the Transaction Documents. The performance of such parties of their respective services, duties, obligations and undertakings is dependent on the solvency of each relevant party

### Risks relating to the Borrower

Set out below is a brief description of the risks specific to the Borrower and the market in which they operate. For the purposes of these risk factors "Account or Loan Receivables" means loans which meet the Eligible Asset.

### These risks are additional to the Risk Factors detailed in the Listing Particulars.

It may not be possible to source sufficient Account or Loan Receivables Performance by the Issuer of its obligations under the Series 2019-CFF1 Notes is dependent on the ability of the Receivables Originator to source Loan Receivables and Account Receivables in a timely manner. Failure to do so, in sufficient amounts or at all, would impact on the ability of the Issuer to make payments of interest and repayments at maturity of principal.

### Reliance on the management team of the Borrower

The Borrower's success depends on the activities of their shareholders, directors, managers and partners, and if one or more of these were unable or unwilling to continue in their position, the business may be disrupted and it might not be possible to find replacements on a timely basis or with the same level of skill and experience. Finding such replacements could be costly which could adversely impact its financial results.

### No due diligence relating to the Underlying Receivables

None of the Issuer or the Servicer, their respective Affiliates or any other person other than the Receivables Originator has undertaken or will undertake any investigations, searches or other actions to verify the information concerning the assets securing the underlying leases or to establish the credit worthiness of any Borrower, and has not taken legal advice on the agreements and other documents evidencing the assets securing the Receivables. The Issuer will rely solely on represen-

INVESTMENT MEMORANDUM ————————————————————————— **Exhibit LJ7 / Page 189**

tations and warranties given by the Receivables Originators in respect of the compliance of the relevant assets with Eligible Asset. These representations and warranties will not cover all relevant matters in relation to the underlying leases or the assets on which they are secured.

### Default by the Borrower

The Issuer will fund payments on the Series 2019-CFF1 Notes from payments received from the Borrower pursuant to the Loan or Loan Receivables. If the Borrower becomes insolvent or otherwise fail to make payments when due under the Account or Loan Receivables, the Issuer may not be able to make payment of interest, principal or any other amounts due on or in connection with the Series 2019-CFF1 Notes on a timely basis or at all. In addition, there are no limits on the amount which may be owed by a single Borrower. Consequently, the Borrower which are obligors under a material amount of Account or Loan Receivables, this could have an increased negative effect on the ability of the Issuer to make payments on the Series 2019-CFF1 Notes.

### No past performance data

The Issuer will be reliant on payments received from the Borrower in order to make payments on the Series 2019-CFF1 Notes.

If the Borrower does not make payments when due under the Account or Loan Receivables, the Issuer may not be able to make payments on the Series 2019-CFF1 Notes when due, or at all. There is no data available in relation to the past performance of receivables of the types which will constitute Account or Loan Receivables.

### Liquidity

The assets of the Borrower will consist principally of Account and Loan Receivebles. The ability to buy or sell assets at any time may be limited. There is no assurance that any amount of assets can be bought or sold at the desired prices or in the desired quantities. In the absence of a liquid market, Noteholders should be aware of the redemption policy and the redemption provisions.

### Credit ratings may not reflect all risks

Notes issued under the Programme may be rated or unrated. Where an issue of Notes is rated or expected to be rated, the applicable rating(s) will be specified in the relevant Final Terms. Such rating(s) will not necessarily be the same as the rating (if any) assigned to Notes already issued. There are no guarantees that such ratings will be assigned or maintained. Any credit rating agency may lower its ratings or withdraw the rating if, in the sole judgement of the credit rating agency, the credit quality of the Notes has declined or is in question. In addition, at any time a credit rating agency may revise its relevant rating methodology with the result that, among other things, any rating assigned to the Notes may be lowered. If any of the ratings assigned to the Notes is lowered or withdrawn, the market value of the Notes may be reduced. Furthermore, the ratings may not reflect the potential impact of all risks discussed in this section, and other factors that may affect the value of the Notes. Accordingly, a credit rating is not a recommendation to buy, sell or hold securities and may be revised or withdrawn by the rating agency at any time.  Any credit ratings assigned to the Notes may not reflect the potential impact of all risks related to structure, market, additional factors discussed above and below, and other factors that may affect the value of the Notes.

### A credit rating reduction may result in a reduction in the trading value of the Notes

The value of the Notes is expected to be affected, in part, by investors' general appraisal of the creditworthiness of the relevant Issuer. Such perceptions are generally influenced by the ratings (if any) assigned to the Notes of such Issuer by standard statistical rating services. A reduction in, or a placing on credit watch of the rating (if any) assigned to any Notes of the relevant Issuer by a rating agency could result in a reduction in the trading value of the relevant Notes.

### Account Receivables

An Account Receivable will constitute a right to an amount due under an invoice issued pursuant to a Commodity Contract between a Commodity Seller and a Commodity Buyer or a right to an amount due under the Commodity Contract itself. Payment of the amount due may however be subject to a defence available to the Commodity Buyer under the Commodity Contract (for example as to the Commodity supplied not meeting the contracted quantity or quality). This risk of non-payment by the Commodity Buyer is partially mitigated by the requirement, in the Receivables Eligibility Criteria for Account Receivables, that a  Commodity Buyer (as an Eligible Obligor) is not entitled (unless required by law) to make any claim for set-off or deduction in respect of any payment due under the Commodity Contract, and by the requirement that the relevant Eligible Account Receivables Originator has performed delivery of the relevant Commodity to the Commodity Buyer in accordance with the terms of that Commodity Contract.

### Failure of legal documentation in a jurisdiction

As trade finance can cover global assets originating in many different jurisdictions, there is a possibility that a security document drafted in accordance with the laws of one jurisdiction will not be recognised under the laws of another jurisdiction. Each Receivable Security will comprise the maximum security which is available and reasonable taking into account the value of the relevant Trade Finance Receivable and as specified for a particular Trade Finance Receivable in the section of this Base Prospectus headed "General Description of the Programme and Use of Proceeds". Each Issuer will take the advice of local counsel on the topic of security where it considers it necessary to do so. Additionally, enforcement of any Receivable Security will vary from jurisdiction to jurisdiction, in terms of both likelihood of successfully enforcing and time (and cost) taken to enforce and recover assets.

**Failure of any Credit Support**

Where the Receivable Security is Credit Support in the form of an assignment of the relevant documentary letter of credit (or a confirmation thereof), stand-by letter of credit, bank guarantee or credit insurance, enforcement against such Credit Support may be against the original beneficiary of the Credit Support as opposed to the Eligible Credit Support Provider because in most instances the Credit Support itself will not be assignable but only the rights will be (including as to payment of proceeds arising thereunder). This means that access to the Eligible Credit Support Provider and recourse will be through the original beneficiary.

Where the Receivable Security is Credit Support in the form of an assignment of proceeds of credit protection insurance, the original policyholder will remain the policyholder. As with the other form of Credit Support where payment may be made to the original beneficiary, there is a risk that certain Eligible Credit Support Providers may discharge their liabilities by paying the proceeds of the Credit Support to the named beneficiary of the Credit Support, rather than to the assignee of the proceeds, despite the Eligible Credit Support Provider in question having been notified of the assignment of the proceeds. In this situation, there is a residual risk that the proceeds are not eventually paid on to the relevant Issuer/Notes and Security Trustee. However, in this situation, the relevant Issuer/Notes and Security Trustee would enforce their respective security over the proceeds of the Credit Support.

In the context of credit protection insurance, there is a second risk that the relevant Issuer/Notes and Security Trustee cannot be added as a loss payee to the policy. Further, the original policyholder may vitiate the insurance policy (i.e. breach a term and cause the policy to terminate). Moreover, where the Receivable Security is Credit Support in the form of an assignment of the proceeds of credit protection insurance, the amount recoverable under the insurance will typically not be the entire Trade Finance Receivable but only around 90 per cent of the amount of the Trade Finance Receivable. The remaining uninsured percentage (typically around 10 per cent) would be required by the relevant underwriters to be borne by the relevant policyholder. Further, credit protection insurance policies will usually contain a provision whereby insurers will require the payment default to have subsisted for at least six months before paying out under the insurance policy. If insurers adhere to this provision then there could be a risk of payment under the insurance policy being made on a date later than the date on which such sums are required by the relevant Issuer to satisfy its obligations under the relevant Notes.

**Eligible Credit Support Provider performance risk**

There is a risk that the provider of any Credit Support will not pay out thereunder (either because of insolvency or otherwise). To mitigate this risk, only Credit Support from an Eligible Credit Support Provider will be accepted.

**Swap Counterparty risk**

The insolvency of the Swap Counterparty or a default by the Swap Counterparty under a Swap Agreement could result in the Issuer being unable to satisfy its obligations under the relevant Notes.

**Co-mingling of assets**

In respect of a Trade Finance Loan for inventory financing, where security is taken over a Commodity, it is usually necessary to be able, for security purposes, to identify the exact Commodity which has been financed in accordance with the relevant Trade Finance Loan Agreement. However, as stocks can move quickly and into different warehouses, there is the potential for a Commodity financed under a Trade Finance Loan Agreement to be co-mingled with other Commodities not connected with the underlying transaction financed by that Trade Finance Loan Agreement. This could potentially make the relevant Receivable Security invalid if the relevant Commodity cannot be ascertained/identified

**Eligible Obligor performance risk**

A Trade Finance Receivable may consist of, or the Receivable Security relating to a Trade Finance Receivable may include, the rights to payment under a Commodity Contract. There is a risk that the relevant Eligible Obligor will default under that Commodity Contract because it is insolvent or because it cannot or does not want to pay for another reason. For example, as Commodity markets are subject to price and volume movements over time this may significantly impact the mark-to- market value of a Commodity. In most cases, the Commodity price volatility is mitigated through matching price determination terms on both a Primary Commodity Contract and a Secondary Commodity Contract but the relevant Primary Commodity Buyer still remains exposed to the risk of the Secondary Commodity Buyer defaulting under its obligation to take delivery and pay for the relevant Commodity thereby potentially impacting the Primary Commodity Buyer's ability to perform its obligations under the Primary Commodity Contract. Commodity Buyer performance risk can be mitigated to an extent by Credit Support, but Credit Support itself may fail (as mentioned above).

**Operational risk**

The Receivables Administrator will, pursuant to a Receivables Administration Agreement, be required to collect, review and confirm the relevant transactional documents in relation to the acquisition of any relevant Eligible Asset. Some of the relevant documents may not be received, whether on time or at all, and the documents received may not be true, complete and accurate, or the review of the documents may be erroneous or incomplete. This may affect the relevant Issuer's ability to recover under the relevant Eligible Asset. The Receivables Administrator will use a dedicated operations team, specialised in independently reviewing those documents, in order to mitigate this risk. In addition, the Issuers will perform their own checks and operate a "four eyes" principle whereby all documents are reviewed by two directors.

INVESTMENT MEMORANDUM

**Sanctions and embargoes**

Sanctions and trade embargoes can be imposed swiftly by governments and without warning. It is therefore possible that performance of obligations under any Specific Agreement and/or Credit Support could become illegal without sufficient notice for the relevant Issuer to be able to take any measures to mitigate its exposure.

**Obtaining good title**

As it is theoretically possible for a Commodity to be used as security several times, without the relevant Issuer having knowledge of the previous security, it is possible that even where a Trade Finance Receivable will be secured by the relevant Receivable Security, title may not pass to the relevant Issuer and thereafter to the Notes and Security Trustee if there has been previous valid security granted in favour of another lender which takes precedence.

**Quality and liquidity of collateral**

The quality and liquidity of financed Commodities are key factors of their economic value and their failure to meet the standards specified in the relevant Commodity Contract may significantly impact their mark-to-market value. The Commodities that will be the subject of the Trade Finance Receivables are deemed to be traded in liquid markets offering sufficient and stable volumes to enable, where the relevant Receivable Security (such as a pledge) has been provided, the sale of the relevant Commodity sufficiently rapidly and on acceptable terms in a work-out scenario in the event that the relevant Eligible Obligor defaults under its obligations in respect of the relevant Trade Finance Receivable. Changes in market conditions including the price of a Commodity may, however, permanently or temporarily impact the liquidity of the relevant Trade Finance Receivable and the commercial conditions in which it is liquidated in a work-out scenario meaning that the relevant Receivable Security is insufficient to cover the amount of the relevant Trade Finance Receivable.

**Country and regional risk**

The price and value of any Trade Finance Receivable may be influenced by the political, financial and economic stability of the country and/or region in which the relevant Eligible Obligor is incorporated or has its principal place of business or of the country in the currency of which the Trade Finance Receivable is denominated.

**Receivable Security will be Perfected (Partly)**

Some Receivable Security will require perfection in order for the security to be fully effective. It is intended that all assignments to an Issuer will in the first instance be fully perfected, and then, where applicable, assigned to the Notes and Security Trustee. In some instances, the assignment of the Receivable Security to the Notes and Security Trustee will be fully perfected (for example, where it is necessary to comply with a deadline imposed by legislation). However, in some instances (in the sole discretion of the relevant Issuer) the perfection will only be part perfected, in order to avoid undue administrative burdens on the Notes and Security Trustee and to allow the Receivables Administrator to undertake its obligations under a Receivables Administration Agreement. There is a risk that full assignment will not be possible due to unforeseen circumstances, for example, as a result of Sanctions.

**Principal Documents**

This section, together with the Listing Particulars, lists principal documents relating to the Series 2019-CFF1 Notes. Copies of the following documents are available for inspection during normal business hours at the registered office of the Issuer. Noteholders are bound by and are deemed to have notice of all the provisions of the agreements.

i.    A Security Trust Deed dated on or around 14 April 2019 between the Issuer and the Security Trustee (as amended, supplemented or restated from time to time);

ii.   An Issuer Deed of Charge made with effect from the Issue Date of each Series between the Issuer and the Security Trustee (as modified, supplemented and/or restated amended or supplemented from time to time) in respect of the obligations of the Issuer under the Notes and securing in favour of the Security Trustee (for the benefit of the Note Trustee, the Noteholders and the other Issuer Secured Creditors) by a fixed charge all of the Issuer's rights in respect of each Transaction Document, each Transaction Agreement, each Account Receivable and Loan Receivable Agreement and each Borrower Security Document;

iii.  A Servicing Agreement dated on or around 14 April 2019 and made between the Issuer, the Servicer, the Borrower, the Note Trustee and the Security Trustee;

iv.   A Trade Finance Origination Agreement dated on or around 14 April 2019 and made between the Issuer, the Servicer, the Borrower, the Note Trustee and the Security Trustee;

v.    A Loan Agreement dated on or around 14 April 2019 and made between the Issuer (as lender) and the Borrower;

vi.   A Pledge over Relevant Accounts dated on or around 14 April 2019 and made between the Borrower (as pledger) and the Issuer (as pledgee), governed by the laws of United Kingdom, relating specifically to the Relevant Assets;

vii.  A Mortgage over the Relevant Assets of the Borrower, relating specifically to the Relevant Assets, dated on or around 14 December 2019 granted by the Borrower (as mortgagors) in favour of the Issuer (as mortgagee), governed by the laws of the United Kingdom and, to the extent applicable, the Cayman Islands;

viii. Listing Particulars

ix.   Pricing Supplement

Exhibit "25"
Page 32 of 40

## Pricing Supplement (2019-CFF1 EUR)

**Date 14th April 2019**
**Issue of up to EUR200,000,000**

**5.50% pa FIXED RATE SECURED NOTES DUE April 2020 under the EUR 8000,000,000 Secured Medium Term Note Programme**

**ISIN: GB00BJRF9H03**
**SERIES 2019-CFF1**

### PART A – CONTRACTUAL TERMS

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions (the "Conditions") set forth in the Listing Particulars dated 14 April 2019 which constitutes a Listing Particulars (the "Listing Particulars").

Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of the Pricing Supplement and the Listing Particulars. The Listing Particulars are available for viewing during normal business hours at 1 Bedford Row, London, WC1R 4BZ and copies may be obtained from the Issuer on request.

| 1. | Issuer | Serica Finance PLC |
|---|---|---|
| 2. | (i) Series Number: | 2019-CFF1 |
| | (ii) Tranche Number: | 1 |
| | (iii) Date on which the Notes become fungible: | Not Applicable |
| 3. | Specified Currency or Currencies: | EUR |
| 4. | Aggregate Nominal Amount: | Up to EUR200,000,000 |
| | (i) Series: | 2019-CFF1 |
| | (ii) Tranche: | 1 |
| 5. | Issue Price: | 100.00 per cent. of the Aggregate Nominal Amount |
| 6. | (i) Specified Denominations: | EUR100,000 |
| | (ii) Integral Multiples: | EUR1,000 in excess thereof |
| | (iii) Calculation Amount: | EUR1,000 |
| | (iv) Minimum Initial Investment | EUR100,000 |
| 7. | Issue Date | 30th April 2019 |
| | (ii) Interest Commencement Date: | 30th April 2019 |
| 8. | Maturity Date: | 30th April 2020 |
| 9. | Interest Basis: | Fixed Rate |
| 10. | Redemption/Payment Basis: | Subject to any purchase and cancellation or early redemption, the Notes will be redeemed on the Maturity Date at 100.00 per cent. of their nominal amount. |
| 11. | Change of Interest or Redemption/Payment Basis: | Not Applicable |
| 12. | Put/Call Options: | Callable at par / 100.00 per cent. of their nominal amount from 30th April 2020 |
| 13. | Date Board approval for issuance of Notes obtained: | 19th April 2019 |

### PROVISIONS RELATING TO INTEREST PAYABLE

| 14. | Fixed Rate Note Provisions | Applicable |
|---|---|---|
| | (i) Rate of Interest: | 5.50% per annum |

INVESTMENT MEMORANDUM ——————————————————————— <span style="color:red">**Exhibit LJ7 / Page 1̶93**</span>

Exhibit "25"
Page 33 of 40

| | (ii) Interest Payment Dates: | 31st July |
| | | 31st October |
| | | 31st January |
| | | 30th April |
| | (iii) Fixed Coupon Amount: | EUR1,375 per Calculation Amount |
| | (iv) Day Count Fraction: | 30E/360 |
| 15. | Floating Rate Note Provisions | Not Applicable |
| 16. | Zero Coupon Note Provisions | Not Applicable |

## PROVISIONS RELATING TO REDEMPTION

| 17. | Call Option | Callable at par / 100.00 per cent. of their nominal amount from 30th April 2020 |
| 18. | Put Option | Not Applicable |
| 19. | Final Redemption Amount of each Note | EUR100,000 per Specified Denomination Amount |
| 20. | Early Redemption Amount | EUR100,000 per Specified Denomination Amount |
| | Early Redemption Amount(s) per Calculation Amount payable on redemption: | Not Applicable |
| 21. | Early Termination Amount | EUR100,000 per Specified Denomination Amount |
| 22. | Unmatured coupons void | Not Applicable |

## GENERAL PROVISIONS APPLICABLE TO THE NOTES

| 23. | Form of Notes: | CREST – Registered |
| 24. | New Global Note: | No |
| 25. | Additional Financial Centre(s) or other special provisions relating to payment dates: | Not Applicable |
| 26. | Talons for future Coupons to be attached to Definitive Notes (and dates on which such Talons mature): | No |

## PART B – OTHER INFORMATION

| 1. | (i) Listing and admission to trading | Application will be made to the Frankfurt Stock Exchange (Open Market (Freiverkehr) by the Issuer (or on its behalf) for the Notes to be admitted to listing and trading on the Frankfurt Stock Exchange at closing. |
| | (ii) Estimated total expenses related to admission to trading | GBP 20,000 |
| 2. | Ratings | TBC |
| 3. | Interests of natural and legal persons involved in the issue/offer | Save as discussed in "Subscription and Sale", so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer. |
| 4. | Fixed Rate Notes only – Yield | |
| | Indication of Yield: | 5.50 per cent. per annum. The yield is calculated at the Issue Date on the basis of the Issue Price. It is not an indication of future yield |
| 5. | Floating rate notes only - historic interest rates | Not Applicable |
| 6. | Operational information | |
| | ISIN code: | GB00BJRF9H03 |

| | Any clearing system(s) other than Euroclear Bank SA/ NV and Clearstream Banking, société anonyme and the relevant identification number(s): | The Notes will be made eligible for CREST |
|---|---|---|
| | Intended to be held in a manner which would allow eurosystem eligibility: | No |
| 7. | Distribution | |
| | (i) U.S. selling restrictions: | Regulation S Compliance Category 2 |
| 8. | Name and address of any paying agents and common depositary: | Avenir Registrars<br>5 St John's Lane<br>London<br>EC1M 4BH |

INVESTMENT MEMORANDUM ———————————————————— Exhibit LJ7 / Page 195

Exhibit "25"
Page 35 of 40

## Pricing Supplement (2019-CFF1 USD)

**Date 30th April 2019**
**Issue of up to USD 200,000,000**

**7.00% pa FIXED RATE SECURED NOTES DUE April 2020 under the EUR 8000,000,000 Secured Medium Term Note Programme**

**ISIN: GB00BJQ31240**
**SERIES 2019-CFF1**

### PART A – CONTRACTUAL TERMS

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions (the "Conditions") set forth in the Listing Particulars dated 14 April 2019 which constitutes a Listing Particulars (the "Listing Particulars").

Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of the Pricing Supplement and the Listing Particulars. The Listing Particulars are available for viewing during normal business hours at 1 Bedford Row, London, WC1R 4BZ and copies may be obtained from the Issuer on request.

| 1. | Issuer: | Serica Finance PLC |
|---|---|---|
| 2. | (i) Series Number: | 2019-CFF1 |
| | (ii) Tranche Number: | 1 |
| | (iii) Date on which the Notes become fungible: | Not Applicable |
| 3. | Specified Currency or Currencies: | USD |
| 4. | Aggregate Nominal Amount: | Up to USD 200,000,000 |
| | (i) Series: | 2019-CFF1 |
| | (ii) Tranche: | 1 |
| 5. | Issue Price: | 100.00 per cent. of the Aggregate Nominal Amount |
| 6. | (i) Specified Denominations: | USD100,000 |
| | (ii) Integral Multiples: | USD1,000 in excess thereof |
| | (iii) Calculation Amount: | USD1,000 |
| | (iv) Minimum Initial Investment | USD100,000 |
| 7. | Issue Date | 7th May 2019 |
| | (ii) Interest Commencement Date: | 7th May 2019 |
| 8. | Maturity Date: | 7th May 2020 |
| 9. | Interest Basis: | Fixed Rate |
| 10. | Redemption/Payment Basis: | Subject to any purchase and cancellation or early redemption, the Notes will be redeemed on the Maturity Date at 100.00 per cent. of their nominal amount. |
| 11. | Change of Interest or Redemption/Payment Basis: | Not Applicable |
| 12. | Put/Call Options: | Callable at par / 100.00 per cent. of their nominal amount from 7th May 2020 |
| 13. | Date Board approval for issuance of Notes obtained: | 19th April 2019 |

### PROVISIONS RELATING TO INTEREST PAYABLE

| 14. | Fixed Rate Note Provisions | Applicable |
|---|---|---|
| | (i) Rate of Interest: | 7.00% per annum |

INVESTMENT MEMORANDUM

**Exhibit LJ7 / Page 196**

| | (ii) Interest Payment Dates: | 7th August<br>7th November<br>7th February<br>7th May |
|---|---|---|
| | (iii) Fixed Coupon Amount: | USD1,750 per Calculation Amount |
| | (iv) Day Count Fraction: | 30E/360 |
| 15. | Floating Rate Note Provisions | Not Applicable |
| 16. | Zero Coupon Note Provisions | Not Applicable |

**PROVISIONS RELATING TO REDEMPTION**

| 17. | Call Option | Callable at par / 100.00 per cent. of their nominal amount from 7th May 2020 |
|---|---|---|
| 18. | Put Option | Not Applicable |
| 19. | Final Redemption Amount of each Note | USD100,000 per Specified Denomination Amount |
| 20. | Early Redemption Amount | USD100,000 per Specified Denomination Amount |
| | Early Redemption Amount(s) per Calculation Amount payable on redemption: | Not Applicable |
| 21. | Early Termination Amount | USD100,000 per Specified Denomination Amount |
| 22. | Unmatured coupons void | Not Applicable |

**GENERAL PROVISIONS APPLICABLE TO THE NOTES**

| 23. | Form of Notes: | CREST – Registered |
|---|---|---|
| 24. | New Global Note: | No |
| 25. | Additional Financial Centre(s) or other special provisions relating to payment dates: | Not Applicable |
| 26. | Talons for future Coupons to be attached to Definitive Notes (and dates on which such Talons mature): | No |

**PART B – OTHER INFORMATION**

| 1. | (i) Listing and admission to trading | Application will be made to the Frankfurt Stock Exchange (Open Market (Freiverkehr) by the Issuer (or on its behalf) for the Notes to be admitted to listing and trading on the Frankfurt Stock Exchange at closing. |
|---|---|---|
| | (ii) Estimated total expenses related to admission to trading | GBP 20,000 |
| 2. | Ratings | TBC |
| 3. | Interests of natural and legal persons involved in the issue/offer | Save as discussed in "Subscription and Sale", so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer. |
| 4. | Fixed Rate Notes only – Yield | |
| | Indication of Yield: | 7.00 per cent. per annum. The yield is calculated at the Issue Date on the basis of the Issue Price. It is not an indication of future yield |
| 5. | Floating rate notes only - historic interest rates | Not Applicable |
| 6. | Operational information | |
| | ISIN code: | GB00BJQ31240 |

INVESTMENT MEMORANDUM ——————————————— **Exhibit LJ7 / Page 197**

Exhibit "25"
Page 37 of 40

| | Any clearing system(s) other than Euroclear Bank SA/ NV and Clearstream Banking, société anonyme and the relevant identification number(s): | The Notes will be made eligible for CREST |
|---|---|---|
| | Intended to be held in a manner which would allow eurosystem eligibility: | No |
| 7. | Distribution | |
| | (i) U.S. selling restrictions: | Regulation S Compliance Category 2 |
| 8. | Name and address of any paying agents and common depositary: | Avenir Registrars<br>5 St John's Lane<br>London<br>EC1M 4BH |



# General Information

**AUTHORISATION**

The Issuer has obtained or will obtain from time to time all necessary consents, approvals and authorisations in connection with the issue and performance of Series 2019-CFF1 Notes.

**LEGAL AND ARBITRATION PROCEEDINGS**

There are not, and have not been, any governmental, legal or arbitration proceedings, (including any such proceedings which are pending or threatened, of which the Issuer is aware), which may have, or have had during the 12 months prior to the date of this Investment Memorandum, a significant effect on the financial position or profitability of the Issuer.

**SIGNIFICANT/MATERIAL CHANGE**

There has been no material adverse change in the financial position or prospects of the Issuer since the date of its incorporation.

**DOCUMENTS ON DISPLAY**

Copies of the following documents may be inspected physically in hard copy during normal business hours at the offices of Issuer at 1 Bedford Row, London, WC1R 4BZ for the life of this Investment Memorandum:

i.   the constitutive documents of the Issuer;
ii.  the Trust Deed;
iii. the Supplemental Trust Deed;
iv.  the Issuer Deed of Charge;
v.   the Servicer Agreement.

**MATERIAL CONTRACTS**

Excepted as disclosed in this Investment Memorandum, there are no contracts having been entered into outside the ordinary course of any of the Issuer's businesses, which are, or may be, material and contain provisions under which the Issuer has an obligation or entitlement which is, or may be, material to the ability of the Issuer to meet its obligations in respect of the Series 2019-CFF1 Notes.

**CLEARING OF SERIES 2019 CFF1 -NOTES**

The Series 2019-CFF1Notes will be uncertificated units of an eligible debt security and will be constituted and deposited into CREST Euroclear UK and Ireland Limited, the Relevant System, title to such units will be held and transferred by means of the Relevant System, and such units will be redeemed by means of the CREST relevant system in all cases in accordance with the CREST Regulations. CREST is the system owned and operated by Euroclear UK and Ireland Limited, of which the
Registrar is a member, which:

i.   enables companies and other persons to hold units of securities issued by them in uncertificated form;

ii.  allows for the transfer, by means of the system of title, of such units which are held in uncertificated form; and

iii. permits the payment of dividends in respect of such securities, the making of rights issues and other corporate actions by participating issuers.

**The ISIN and SEDOL for the Series 2019-CFF1 Notes are:**

SEDOL: BGBJRF9H0 / OPOL: XFRA (Frankfurt)/ ISIN: GB00BJRF9H03
SEDOL: BJQ3124 / OPOL: XFRA (Frankfurt)/ ISIN: GB00BJQ31240

**NOTE TRUSTEE'S AND SECURITY TRUSTEE'S ACTION**

The Conditions and the Trust Deed provide for the Note Trustee and Security Trustee to take action on behalf of the Noteholders in certain circumstances, but only if the Note Trustee or the Security Trustee is indemnified and/or secured and/or pre-funded to its satisfaction. It may not always be possible for the Note Trustee or the Security Trustee to take certain actions, notwithstanding the provision of an indemnity and/or security and/or pre-funding to it. Where the Note Trustee or Security Trustee is unable to take any action, the Noteholders are permitted by the Conditions and the Trust Deed to take the relevant action directly.

**Exhibit LJ7 / Page 199**

## TRANSACTION PARTIES

**REGISTERED OFFICE OF THE ISSUER**
Serica Finance PLC
1 Bedford Row, London,
WC1R 4BZ

**NOTE TRUSTEE**
GRM Law Trustees Limited
1 Bedford Row
London WC1R 4BZ

**SECURITY TRUSTEE**
GRM Law Trustees Limited
1 Bedford Row
London WC1R 4BZ

**PAYING AGENT**
Avenir Registrars
5 St. John's Lane
London
EC1M 4BH

**LEGAL COUNSEL TO THE ISSUER**
DWF LP
20 Fenchurch Street
London
EC3M 3AG

**REGISTRAR**
Avenir Registrars
5 St. John's Lane
London
EC1M 4BH

**ARRANGER & CALCULATION AGENT**
Bedford Row Capital Advisors Ltd
1 Bedford Row, London,
WC1R 4BZ

**ACCOUNT BANK**
Barclays Bank PLC,
United Kingdom.

**Auditor**
BDO LLP
31 Chertsey Street, Guildford, Surrey, GU1 4HD

INVESTMENT MEMORANDUM ————————————————————— **Exhibit LJ7 / Page 200**

Exhibit "25"
Page 40 of 40